**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Christina Donahue, as Administratrix of the | : | |
| Estate of Angel McIntyre, deceased, et al., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: 22-1695 |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| Borough of Collingdale, et al. | : | |
| | : | |
| Defendants. | : | |

**RESPONSE OF PLAINTIFFS IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56**

Plaintiffs, Christina Donahue, as Administratrix of the Estate of Angel McIntyre, deceased, Matthew Munafo, and Kristyanna Dellavecchia, by and through undersigned counsel, hereby respond in opposition to the Motion for Summary Judgment of Defendants, Borough of Collingdale and Officer Colin Richers, under Fed. R. Civ. P. 56. Plaintiffs annex a Brief in support of their opposition and incorporate the same by reference herein.

For the reasons set forth herein, this Honorable Court should deny the Motion for Summary Judgment of Defendants Borough of Collingdale and Officer Collin Richers. Oral argument is requested.

Respectfully submitted,

Dated: November 20, 2023

*/s/ Elizabeth A. Bailey*
Elizabeth A. Bailey
Steven A. Medina
Grant & Eisenhofer
123 Justison Street
Wilmington, DE 19801
302-622-7086
ebailey@gelaw.com
smedina@gelaw.com

*Attorneys for Plaintiffs Christina Donahue, as Administratrix of the Estate of Angel McIntyre, deceased, Matthew Munafo, and Kristyanna Dellavecchia*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Christina Donahue, as Administratrix of the | : | |
| Estate of Angel McIntyre, deceased, et al., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: 22-1695 |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| Borough of Collingdale, et al. | : | |
| | : | |
| Defendants. | : | |

## BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF DEFENDANTS BOROUGH OF COLLINGDALE AND OFFICER COLIN RICHERS

On the Brief,

Dated: November 20, 2023

Elizabeth A. Bailey
Steven A. Medina
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801
302-622-7086
ebailey@gelaw.com
smedina@gelaw.com

*Attorneys for Plaintiffs Christina Donahue, as Administratrix of the Estate of Angel McIntyre, deceased, Matthew Munafo, and Kristyanna Dellavecchia*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................ii, iii, iv, v, vi

INTRODUCTION AND PROCEDURAL HISTORY.................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

APPLICABLE LEGAL STANDARDS ................................................................... 3

ARGUMENT ........................................................................................................ 4

A.    SUMMARY JUDGMENT SHOULD BE DENIED AS TO COUNT I OF THE
      COMPLAINT, AS TRIABLE ISSUES OF FACT EXIST AS TO WHETHER OFFICER
      RICHERS' DANGEROUS PURSUIT OF ANTHONY JONES VIOLATED
      PLAINTIFFS' CONSTITUTIONAL RIGHTS ...................................................... 4

B.    OFFICER RICHERS IS NOT ENTITLED TO SUMMARY JUDGMENT BASED ON
      QUALIFIED IMMUNITY. ............................................................................... 16

C.    SUMMARY JUDGMENT SHOULD BE DENIED AS TO THE MONELL CLAIMS
      AGAINST COLLINGDALE, AS TRIABLE ISSUES OF FACT EXIST AS TO
      WHETHER COLLINGDALE'S POLICIES, CUSTOMS, PRACTICES AND FAILURE
      TO TRAIN RESULTED IN THE DEPRIVATION OF PLAINTIFFS'
      CONSTITUTIONAL RIGHTS ........................................................................ 19

          1.    Collingdale Had a De Facto Custom of Allowing Officers to Recklessly
               Pursue Suspects Over Summary Offenses...................................................20

          2.    Collingdale's Failure to Train, Supervise, or Discipline Police Officers on
               Vehicle Pursuits and the Borough's Pursuit Policy Amounts to Deliberate
               Difference ...........................................................................................23

D.    PLAINTIFFS' STATE LAW NEGLIGENCE CLAIMS (COUNTS III AND V) ARE NOT
      BARRED BY GOVERNMENTAL OR OFFICIAL IMMUNITY ................................ 26

E.    PLAINTIFFS' RECKLESS DISREGARD OF SAFETY CLAIM (COUNT IV) AGAINST
      OFFICER RICHERS ALLEGES WILLFUL CONDUCT DISTINCT FROM
      ALLEGATIONS OF NEGLIGENCE ................................................................. 30

F.    THE AT-ISSUE WRONGFUL DEATH AND SURVIVAL CLAIMS (COUNTS VII AND
      VIII) ARE VALID CLAIMS GOVERNED BY THE TORT CLAIMS ACT................... 31

G.    THE PRESENT EMOTIONAL DISTRESS CLAIMS FALL WITHIN THE TORT
      CLAIM ACT'S VEHICLE EXCEPTION........................................................... 31

H.    THE TORT CLAIMS ACT DOES NOT PRECLUDE PLAINTIFFS' MUNICIPAL
      LIABILITY CLAIM (COUNT VI) BECAUSE THE VEHICLE LIABILITY EXCEPTION
      APPLIES..................................................................................................... 32

CONCLUSION.................................................................................................... 34

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*,
  669 F.3d 359 (3d Cir. 2012)...................................................................................7

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................................3, 4

*Arnold v. City of Philadelphia*,
  151 F. Supp. 3d 568 (E.D. Pa. 2015) ...................................................................15

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011)...........................................................................................16

*Balentine v. Chester Water Authority*,
  191 A.3d 799 (Pa. 2018) .................................................................................33

*Berg v. Cnty. of Allegheny*,
  219 F.3d 261 (3d Cir. 2000)...............................................................................24

*Bielevicz v. Dubinon*,
  915 F.2d 845 (3d Cir. 1990).............................................................................21

*Black v. Stephens*,
  662 F.2d 181 (3d Cir.1981), *cert. denied*, 455 U.S. 1008 (1982)...........................21

*Brown v. Pa. Dep't of Health & Emergency Med. Servs. Training Inst.*,
  318 F.3d 473 (3d Cir. 2003)...............................................................................11

*Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*,
  272 F.3d 168 (3d Cir. 2001)................................................................................7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..............................................................................................4

*City of Oklahoma City v. Tuttle*,
  471 U.S. 808 (1985)..............................................................................................7

*Clark v. Merrell*
  No. CV 19-1579, 2021 WL 288791 ..............................................................14,18

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998)..............................................................................10, 14, 18

*Connick v. Thompson*,
  563 U.S. 51 (2011) ...................................................................................................24

*Cornelius v. Roberts*,
  71 A.3d 345 (Pa. Commw. 2013) ..........................................................................27

*Costobile-Fulginiti v. City of Philadelphia*,
  719 F. Supp. 2d 521 (E.D. Pa. 2010) ....................................................................31

*Fagan v. City of Vineland*,
  22 F.3d 1283 (3d Cir. 1994) ...................................................................................23

*Forrest v. Parry*,
  930 F.3d 93 (3d Cir. 2019) .....................................................................................20

*Garey v. Borough of Quakertown*,
  No. 12-CV-0799, 2013 WL 3305222 (E.D. Pa. July 1, 2013) (Baylson, J.) .........19

*Griggs v. SEPTA*,
  No. CV 14-6226, 2016 WL 4055050 (E.D. Pa. July 28, 2016) (Baylson, J.)..........3

*Haberle v. Troxell*,
  885 F.3d 170 (3d Cir. 2018) ..........................................................................10, 11

*Hernandez v. Independence Tree Service LLC*,
  2019 WL 1773374 (E.D. Pa. 2019) ..................................................................33, 34

*D.M. ex rel. J.M. v. Cnty. of Berks*,
  27 F. Supp. 3d 594 (E.D. Pa. 2014) (Baylson, J.) .................................................16

*Kneipp v. Tedder*,
  95 F.3d 1199 (3d Cir. 1996) ...................................................................................21

*Krivijanski v. Union Railroad Co.*,
  515 A2d 933 (Pa. Super. 1986) ..............................................................................30

*Lindstrom v. City of Corry*,
  763 A.2d 394 (Pa. 2000) .........................................................................................27

*Lopuszanski v. Fabey*,
  560 F.Supp. 3 (E.D. Pa. November 18, 1982) .......................................................29

*M.U. v. Downingtown High Sch. E.*,
  103 F. Supp. 3d 612 (E.D. Pa. 2015) ...............................................................23, 30

*Mammaro v. N.J. Div. of Child Prot. & Permanency*,
  814 F.3d 164 (3d Cir. 2016) ...................................................................................16

*Marks v. Philadelphia Indus. Corr. Ctr.*,
  No. CIV.A. 14-5168, 2014 WL 5298008 (E.D. Pa. Oct. 15, 2014)........................................31

*Matthews v. Konieczny*,
  515 Pa. 106, 527 A.2d 508 (1987) (*internal quotation marks and citation*
  *omitted*) ......................................................................................................................................26

*McDaniels v. City of Philadelphia*,
  234 F. Supp. 3d 637 (E.D. Pa. 2017) .....................................................................................26

*Mid-Century Ins. Co. v. Werley*,
  No. CV 21-5592, 2023 WL 2727575 (E.D. Pa. Mar. 30, 2023) (Smith, J.) ..............................3

*Minor v. Delaware River & Bay Auth.*,
  70 F.4th 168 (3d Cir. 2023) ...................................................................................................17

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978).....................................................................................................1, 19, 22, 26

*North Sewickley Tp. v. LaValle*,
  786 A.2d 325 (Pa. Commw. Ct. 2001) ...................................................................................33

*Overstreet v. The Brgh. of Yeadon*,
  475 A.2d 803 (Pa. Super. 1984).............................................................................................29

*Pearson v. Callahan*,
  555 U.S. 223 (2009)................................................................................................................16

*Planned Parenthood of S.E. Pa. v. Casey*,
  505 U.S. 833 (1992)..................................................................................................................6

*Regan v. Twp. of Lower Merion*,
  36 F. Supp. 2d 245 (E.D. Pa. 1999) ......................................................................................32

*Estate of Roman v. City of Newark*,
  914 F.3d 789 (3d Cir. 2019)..............................................................................................19, 20

*Saucier v. Katz*,
  533 U.S. 194 (2001)................................................................................................................16

*Sauers v. Borough of Nesquehoning*,
  905 F.3d 711 (3d Cir. 2018)........................................................................................ *passim*

*Scott v. Harris*,
  550 U.S. 372 (2007)...............................................................................................................4, 5

*Estate of Smith v. Marasco*,
  318 F.3d 497 (3d Cir. 2003)....................................................................................................15

*Sullivan v. Warminster Twp.*,
   No. 07–4447, 2010 WL 2164520 (E.D. Pa. May 27, 2010) ...................................................31

*Thompson v. City of Phila.*,
   No. CV 20-3134, 2022 WL 17364640 (E.D. Pa. Dec. 1, 2022) (Baylson, J.)........................23

*Tinch v. Lazaro*,
   No. CV 20-5563, 2022 WL 1694181 (E.D. Pa. May 26, 2022) (Baylson, J.)........................19

*United States v. Benish*,
   5 F.3d 20 (3d Cir.1993).........................................................................................................32

*Vargas v. City of Philadelphia*,
   783 F.3d 962 (3d Cir. 2015)......................................................................................................7

*Williams v. City of Philadelphia Office of Sheriff*,
   2020 WL 315594 (E.D. Pa. 2020) .........................................................................................33

*Wilson v. Layne*,
   526 U.S. 603 (1999)..........................................................................................................16, 18

*Wishkin v. Potter*,
   476 F.3d 180 (3d Cir. 2007)......................................................................................................4

**Statutes**

Fed. R. Civ. P 8(d)(2)...................................................................................................................30

Fed. R. Civ. P. 56 ..........................................................................................................................3

Pa. R.C.P. 1020(c).......................................................................................................................30

42 Pa. C.S.A. §§ 8541 and 8542(a)–(b) ......................................................................................27

42 Pa. C.S.A. § 8545 ....................................................................................................................29

42 Pa. C.S.A. § 8550....................................................................................................................29

42 U.S.C. § 1983.....................................................................................................7, 19, 23, 30

Pennsylvania Political Subdivision Tort Claims Act..................................................26, 31, 32, 33

Pennsylvania Survival Act, 42 Pa. C.S. § 8302 .........................................................................31

Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301 .............................................................31

U.S. Const. amend. XIV § 1 ...............................................................1, 6, 7, 15, 18, 23

U.S. Constitution..........................................................................................................................7

**Other Authorities**

Restatement (Second) of Torts § 500............................................................................................30

## <u>INTRODUCTION AND PROCEDURAL HISTORY</u>

This litigation centers on an improper and needless 90-mile-per-hour vehicle pursuit occurring in the early morning hours of July 16, 2020. At that time, police officers from the Boroughs of Collingdale and Darby pursed a Ford Escape operated by Anthony Jones over suspected summary traffic offenses. Their decision to do so would cause Mr. Jones to crash the Escape into a vehicle operated by Plaintiff Matthew Munafo, (age 20). Mr. Munafo was ejected 50 to 100 miles per hour from the vehicle; he sustained a traumatic brain injury and numerous other physical injuries. His passenger, Angel McIntyre (age 18), was killed by the collision. Angel's sister, Kristyanna Dellavecchia (age 22), was a passenger in a vehicle following directly behind Matthew's vehicle. She witnessed the collision and her sister's death.

On May 3, 2022, Plaintiffs Matthew, Kristyanna, and Christina Donahue, as Administratrix of the Estate of Angel McIntyre, filed a ten-count Complaint against the Boroughs of Collingdale and Darby, as well as number of the involved police officers: Collingdale Officer Colin Richers; Darby Officer Jake Lyons; and Darby Officer Dante Lynch. The Complaint sets forth the following claims: (1) 14th Amendment Substantive Due Process Violations (All Plaintiffs v. The Police Officer Defendants); (2) *Monell* Liability (All Plaintiffs v. The Municipal Defendants); (3) Negligence (All Plaintiffs v. The Police Officer Defendants); (4) Reckless Disregard of Safety (All Plaintiffs v. The Police Officer Defendants); (5) Negligence – Vicarious Liability (All Plaintiffs v. The Municipal Defendants); (6) Negligence – Direct Liability (All Plaintiffs v. The Municipal Defendants); (7) Wrongful Death (Christina Donahue v. All Defendants); (8) Survival (Christine Donahue v. All Defendants); (9) Negligent Infliction of Emotional Distress (Kristyanna v. The Police Officer Defendants); and (10) Outrageous Conduct Causing Severe Emotional Distress (Kristyanna v. The Police Officer Defendants).

The record developed during the discovery phase of this litigation demonstrates that numerous individual and institutional failures on the part of Collingdale, Darby, and their respective police officers led to this tragic collision. The Defendant police officers received no training from their police departments on vehicle pursuits, safe driving tactics, or their department's respective vehicle pursuit policies. Routinely, high-speed pursuits at both Boroughs were improperly initiated over minor offenses, without any consideration as to the risks posed by those vehicle pursuits. Supervision during pursuits was non-existent, and post-incident review did not occur. Officers were never disciplined for improper conduct during pursuits, and thus they believed that their improper conduct would be tolerated and condoned, which proved true. Indeed, the Boroughs even failed to report vehicle pursuits to the Pennsylvania State Police, which municipal police departments are legally required to do.

With this framework in mind, it is not surprising that the pursuit of Anthony Jones violated Darby and Collingdale pursuit policies, Pennsylvania law regarding the use of emergency vehicles, and was incompatible with modern law enforcement principles. The officers involved — at least five— pursued Jones as he weaved around double-parked cars, ran red lights, and drove on the wrong side of the road. Rather than terminate the pursuit because of these life-threating actions, the involved-officers mirrored Jones' movements to keep up with him. They continued the pursuit without any active supervision by a commanding officer. Indeed, despite failing to keep his siren activated, Officer Collin Richers admits to ignoring traffic lights as the pursuit convey passed approximately 20 intersections, finally ending when the Escape struck Matthew's vehicle at Oak Lane and MacDade Boulevard. The attitude of these officers is best exemplified by what occurred when Collingdale Officer Richers approached the scene of the accident. At that time, he took no

notice of a critically injured Matthew Munafo, who lay on the side of the road. According to Richers, he was not concerned with the "road debris" – namely Mr. Munafo - at that time.

With discovery now complete, both sets of Defendants have moved for summary judgment. In moving for Summary Judgment here, Collingdale has not moved for Summary Judgment for Count VI of Plaintiffs' Complaint. Still, for the reasons set forth herein, Collingdale Defendants' motion for the remainder of plaintiffs' claims should be denied.

## STATEMENT OF FACTS

For the sake of brevity, Plaintiffs incorporate their annexed Plaintiffs' Responses to Defendants' Statement of Undisputed Facts ("RSF") and Plaintiffs' Statement of Additional Facts in Support of Plaintiffs' Response to Defendants' Motion for Summary Judgment Counterstatement of Material facts ("SAF") as if set forth at length herein.

## APPLICABLE LEGAL STANDARDS

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, the materials in the record show "that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Griggs v. SEPTA*, No. CV 14-6226, 2016 WL 4055050, at *8 (E.D. Pa. July 28, 2016) (Baylson, J.). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Mid-Century Ins. Co. v. Werley*, No. CV 21-5592, 2023 WL 2727575, at *6 (E.D. Pa. Mar. 30, 2023) (Smith, J.) (quoting *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012)). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is only appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (citation omitted). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Further, when one party's story is "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not "adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ARGUMENT

### A.    Summary Judgment Should Be Denied as to Count I of the Complaint, as Triable Issues of Fact Exist as to Whether Officer Richers' Dangerous Pursuit of Anthony Jones Violated Plaintiffs' Constitutional Rights

First, Collingdale Defendants basis for summary judgment Officer Richers by relies on distorted view of a factual record. Contrary to Defendants' post-incident rationalization, there is no question that the pursuit of Anthony Jones began over suspected traffic offenses and not for a purported "felony assault" resulting from Jones' subsequent sideswipe of a Darby Borough police vehicle operated by Officer Lyons. (SAF at ¶¶ 16-19, 22-48). Well before that sideswipe, Officer Richers attempted to pull over Jones for summary traffic offenses, Jones stopped momentarily and

then began to drive away from Officer Richers again. (*Id.*) Upon witnessing Jones' action, Officer Richers used his police radio to report that Jones was "taking off on me." (SAF at ¶ 17). This caused nearby police officers, including Defendant Officers Lynch and Lyons, to head to the scene of Richers' pursuit. (SAF at ¶ 24). When Jones pulled into a McDonald's parking lot Defendant Officer Lyons attempted to create a blockade. (SAF at ¶ 33). Jones stopped momentarily, but then quickly accelerated again, and Officer Richers followed suit. (SAF at 31). Richers admitted that the only offense he was pursuing Jones for at this point was the initial summary traffic offenses. (SAF at ¶ 39). He admitted that Jones had not committed a felony or misdemeanor that would require a full custody arrest at this point in time. (SAF at ¶ 40). He admitted that Jones did not present a danger to human life or a risk of serious injury. (SAF at ¶ 41). Nevertheless, Richers continued to pursue Jones and radioed that Jones was "taking back off through the drive-thru." (SAF at ¶ 47).

As Richers was pursuing Jones through the parking lot and *after* Richers started his pursuit once more and radioed that he was in fact pursuing Jones again, Jones sideswiped the back rear of Officer Lyons' van while attempting to navigate through a small opening in the exit lane. (SAF at ¶¶ 47-48). Richers admitted that his decision to start his car and continue after Jones had nothing to do with the sideswipe of Lyons' vehicle because that occurred *after* his decision to pursue and *after* his radio communication. (*Id.*) Richers agreed that he was going to pursue Anthony Jones regardless of the sideswipe, as he was already engaging in the pursuit when it occurred. (SAF at ¶ 50). Richers agreed that it appeared to him as if Jones was trying to "go between the Darby van on the left and the red sedan on the right to get out of the exit of this McDonalds." (SAF at ¶ 51)

Before even exiting the parking lot, Officer Richers was traveling at 23 miles-per-hour. (SAF at ¶ 64). While the collision with Officer Lyons' van should have been a clear indication that

this unnecessary pursuit was dangerous and only likely to become more so when Jones hit the open road, and thus needed to be immediately terminated by Officer Richers, it instead provided him with an after-the-fact, false justification for apprehending Jones, the traffic offender, by any means necessary. After the collision, the conduct of Jones and pursuing police officers, including Officer Richers, only became more dangerous, more egregious, and more likely to lead to injury or death. Well before the fatal collision at issue in this action — Jones reached excessive speeds, ran steady red traffic signals, swerved around double-parked cars, and drove on the wrong side of the road. (SAF at ¶¶ 76, 79-82) Rather than terminate the pursuit after witnessing any number of these clear signals that the pursuit was almost certain to result in death or injury if allowed to continue, Officer Richers decided to mirror Jones' most dangerous movements without keeping the siren on his police vehicle active at all times. (SAF at ¶¶ 76, 79-82, 87). At trial, Plaintiffs will present expert testimony evidencing that Officer Richers' behavior wholly failed to conform to any reasonable understanding of modern law enforcement principles and, moreover, caused Jones' behavior to become increasingly dangerous. *See generally*, Report of Paul M. Pazen (**Ex. W**); Report of Geoffrey P. Alpert, Ph.D (**Ex. GG**). As alleged in Count I of the Complaint, and with discovery complete, it is clear that Officer Richers' conduct was egregious and constitutionally violative of the 14th Amendment's right to substantive due process of law because his actions constitute a state-created danger.

The Due Process Clause of the 14th Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. The Due Process Clause includes both a procedural and substantive component. *Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 846-47 (1992). "The substantive component of the Due Process Clause 'protects individual liberty against certain government actions regardless of the fairness of

the procedures used to implement them.'" *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir. 2001) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)) (internal citations and quotation marks omitted). "Substantive due process contains two lines of inquiry: one that applies when a party challenges the validity of a legislative act, and one that applies to the challenge of a non-legislative action." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (citing *Casey*, 505 U.S. at 846-47). When the challenged conduct is non-legislative, a plaintiff "must show that the particular interest in question is protected by the Fourteenth Amendment and that the government's deprivation of that interest 'shocks the conscience.'" *Vargas v. City of Philadelphia*, 783 F.3d 962, 973 (3d Cir. 2015) (citations omitted).

42 U.S.C. § 1983 allows a party who has been deprived of rights, privileges, or immunities secured by the Constitution to seek damages and injunctive relief. Section 1983 is not in itself a source of substantive rights; it provides a remedy for violations of rights protected by other federal statutes or by the U.S. Constitution. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). Therefore, in evaluating a § 1983 claim, a court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Id*. (*citing Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

The state created danger theory of liability embodies the principle that the government has an obligation under the Fourteenth Amendment's Due Process Clause "to protect individuals against dangers that the government itself creates." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018) (quoting *Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018)). Establishing a claim under the doctrine requires a plaintiff to plead four elements:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* The record demonstrates that Plaintiffs clearly satisfied each of these elements.

The record establishes that Plaintiffs' claims meet each of the elements necessary to hold Officer Richers liable for a Substantive Due Process Violation under a state-created danger theory of liability.  As to elements 1 (the nature of harm caused) and 3 (the foreseeability of the victim), Officer Richers admits that the high-speed pursuit of Jones created the foreseeable risk of a catastrophic motor vehicle collision that could cause death and severe injury to innocent civilian motorists and passengers, like Plaintiffs. (SAF at ¶ 42). Similarly, Collingdale Officer Thayer McCauley, who participated in the pursuit, testified that the risk to innocent bystanders is present in every police pursuit, police officers are aware of the risk, and thus must consider it. (SAF at ¶ 43). As Collingdale Chief of Police Kenneth Felker testified, the greatest risk of a vehicle pursuit is the risk of injury, which includes injuries to third parties. (SAF at ¶ 44). Moreover, the Collingdale pursuit policy specifically prohibits pursuits for summary traffic offenses, precisely because of the unjustified risk such pursuits pose to officers, suspects, and members of the general public, like Plaintiffs. As Plaintiffs' law enforcement expert, Paul M. Pazen, former Chief of Police for the City of Denver, will explain, Officer Richers' actions were inconsistent with a modern law

enforcement understanding of the risks inherent to vehicle pursuits. Pazen Report, attached as **Ex. "W"**

As to element 4 (the affirmative use of authority by the state actor to create danger), the affirmative decision to initiate, continue, and fail to terminate a high-speed vehicle pursuit amounts to an affirmative use of authority by Officer Richers and that this use of authority created a risk to innocent bystanders in the area of the pursuit, such as Plaintiffs, greater than the risk of declining to pursue for suspected summary traffic offenses. Moreover, at trial Plaintiffs will present testimony from Geoffrey P. Alpert, Ph.D., a criminologist and expert witness for Plaintiffs who will testify that physiological changes that occur during the course of a vehicle pursuit make it unlikely that pursued suspect will stop while the police officer continues to pursue:

> Both the officer and suspect are likely to become excited, experience an increased heart rate, experience higher blood pressure, and undergo other physiological changes, often including myopia and auditory lockout. Officers tend to focus on capturing the suspect to the exclusion of other concerns. Suspects, in turn, tend to have their eyes glued to the rearview and/or sideview mirrors to see what the officer is doing and if they are continuing to chase. In any case, both parties' decision-making skills will be impacted and often impaired. If officers continue to pursue it is more likely than not that suspects will continue to flee. This will continue until one party terminates their efforts to escape or flee or there is a mechanical failure or crash. It is not reasonable to assume that suspects will stop once they have fled from a police officer. While it can happen, it is more likely than not that a suspect will continue to flee as long as they are being chased.

Alpert Report, at p. 5, attached as **Ex "GG"**. This opinion is corroborated by the testimony of Anthony Jones during his criminal trial. Specifically, Mr. Jones testified to being paranoid, anxious, scared, and nervous during the course of the pursuit. (SAF at ¶ 45). Mr. Jones recalls wanting to get away to avoid "any type of conflict with [Officer Richers]" because he did not know he had committed traffic offenses and thought he was being racially profiled. (SAF at ¶ 46). He

believed this viewpoint was reinforced as the pursuit unfolded in the McDonald's parking lot, as Jones — who had not committed anything other than a summary traffic offense at the time — noticed police vehicles were attempting to block him into the parking lot. (SAF at ¶ 49). Ultimately, Jones testified that he only saw Mr. Munafo's car entering the intersection of Oak Lane "at the last minute, because when I was driving I had turned around for a brief second, to see how far back the cop was from behind me." (SAF at ¶ 95).

The record shows that Officer Richers' improper use of his authority to pursue, as well as the similar improper uses of authority by other police officers involved in the pursuit, gave rise to Jones' desire to flee, thereby affirmatively continuing the duration of the pursuit and increasing the speed at which the vehicles involved in the pursuit were travelling. This, in turn, directly created a risk of a catastrophic collision between the Escape and any other nearby vehicles and persons, that would not have otherwise existed under a proper use of authority. Stated differently, this tragic incident would not have occurred but for Officer Richers' and other police officers' improper use of their authority to pursue Jones over suspected traffic offenses.

Regarding element 2 (whether conduct shocks the conscious), the level of culpability required "to shock the contemporary conscious" falls along a spectrum dictated by the circumstances of each case. *County of Sacramento v. Lewis*, 523 U.S. 833, 847-49 (1998). With respect to the decision-making process of police officers, there are three distinct categories of culpability depending on how much time a police officer has to make a decision. *Haberle*, 885 F.3d at 177. In one category are actions taken in a "hyper pressurized environment[.]" *Id.* (citation omitted). They will not be held to shock the conscience unless the officer has "an intent to cause harm." *Id.* (*citation omitted*). Next are actions taken within a time frame that allows an officer to engage in "hurried deliberation." *Id.* (*citation omitted*). When those actions "reveal a conscious

disregard of a great risk of serious harm" they will be sufficient to shock the conscience. *Id.* (*quotation marks and citation omitted*). Finally, actions undertaken with "unhurried judgments," with time for "careful deliberation," will be held to shock the conscience if they are "done with deliberate indifference." *Id.* (citation omitted). This "shocks the conscience" analysis applies to police vehicle pursuit cases. *Brown v. Pa. Dep't of Health & Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 480 (3d Cir. 2003).

In *Sauers v. Borough of Nesquehoning*, the Third Circuit held that similar conduct by a police officer defendant amounted to the officer acting with a degree of culpability that shocks the conscious, as required to establish a substantive due process violation. 905 F.3d 711, 717 (3d Cir. 2018). The *Sauers* plaintiff and his wife were driving southbound on Route 209 in the Borough of Nesquehoning, Pennsylvania. *Id.* at 715. At the same time, the police officer defendant was on patrol, traveling in the same direction as the plaintiff, when he observed the driver of a yellow Dodge Neon commit a summary traffic offense in the northbound lane. *Id.* Based on that observation, he turned around and began to pursue the Dodge. *Id.* At some point he took the time to radio ahead to the police in the neighboring borough to request that officers there pull the Dodge over when it reached their jurisdiction. *Id.* But rather than let the matter rest, he decided that catching the Dodge was important enough to warrant a chase at speeds of over 100 miles per hour. *Id.* During the pursuit, the police officer defendant lost control of his vehicle, and struck the plaintiff's car. The accident seriously injured the plaintiff and killed his wife. *Id.*

On appeal, the Third Circuit noted that the district court "rightly interpreted the complaint to allege [the police officer defendant] had at least some time to deliberate before deciding whether and how to pursue the traffic offender." *Sauers*, 905 F.3d at 718. As a result, the Third Circuit concluded that *Sauers'* fact-pattern fell in the second category of culpability, requiring inferences

or allegations of a conscious disregard of a great risk of serious harm. *Id.* The Third Circuit reasoned that the conclusion was supported, in part, by an obvious inference that there was no emergency arising from a ***simple traffic violation***. *Id.* The Third Circuit held that there was no difficulty in deciding that the pursuit of a potential summary traffic offender at speeds of over 100 miles per hour, after radioing for assistance from the neighboring jurisdiction where the potential offender was headed, demonstrates a conscious disregard of a great risk of serious harm. *Id.*

In accord with *Sauers*, at most, the hurried deliberation standard is applicable to this case. As the Pazen Report explains from the perspective of a former law enforcement officer, the time between the moment when Officer Richers decided to initiate a traffic stop (12:59am) and the moment Jones began to accelerate in the McDonald's parking lot (1:01am) provided Officer Richers with ample opportunity to weigh the extreme risks posed to officers, the suspect, the passengers, and members of the public by an inherently dangerous pursuit against the insignificant need to apprehend Jones for summary traffic offenses. Pazen Report, at 38, attached as **Ex. "W".** Rather than do so, Officer Richers embarked on a course of conduct that reveals his conscious disregard for the great risk of serious harm and thus is sufficient to shock the conscience. Four circumstances explain why.

*First*, before Jones even reached the McDonald's parking lot, after Mr. Jones had only committed summary traffic offenses, Officer Richers unnecessarily raised the alarm of his fellow officers and escalated the situation by radioing that Jones was "taking off on [him]". That communication, coupled with the bad decisions of Darby Officers, led to the creation of a dangerous and unnecessary blockade of the McDonald's parking lot, for the purpose of apprehending a suspected traffic offender.

*Second*, Officer Richers failed to terminate the pursuit after it resumed in the McDonald's parking lot despite witnessing Jones' sideswipe of Officer Lyons' vehicle (and a contemporaneous near-miss with an innocent bystander's occupied vehicle), which was a dire warning that the pursuit was likely to result in serious harm if allowed to continue.

*Third*, Officer Richers improperly failed to terminate the pursuit as Jones ran red traffic signals, swerved around stopped vehicles, drove on the wrong side of the road, and reached speeds as high as 94-mph. It is undisputed that Officer Richers had the duty and the authority to terminate the pursuit at any point he deemed it too dangerous to continue, and it was too dangerous from the outset. Rather than terminate, Richers continued the pursuit as Jones became more dangerous and, worse still, mirrored reckless Jones' movements in an attempt to continue the pursuit. Like Jones, Richers ran red traffic signals, swerved onto the wrong side of the road, and reached excessive speeds (82 mph) on a road with posted 25-mph-limit.

*Fourth*, contrary to Defendants' argument, Officer Richers admits that he failed to keep his sirens activated at all times during the pursuit of Jones down MacDade Blvd., which violated both Collingdale's pursuit policy and demonstrates an inexcusable lack of concern for the safety of the public. (SAF at ¶¶ 61,81). It also violates Pennsylvania's law governing the use of emergency vehicles during a pursuit, because emergency vehicles are required to keep both lights and sirens active during a pursuit. 75 P.S. 3105. The same law also requires emergency vehicles to slow as they approach red lights. *Id.* The video evidence clearly shows that Officer Richers did not do this at any point during the course of the pursuit. (SAF at ¶ 61). Instead, as he ran red traffic signals and avoided stopped cars by driving on the wrong side of the road, his speed increased rapidly until the pursuit's traffic conclusion. (SAF at ¶¶ 65, 79).

And *fifth,* Officer Richers engaged in all this behavior despite understanding that such high-speed pursuits created a foreseeable risk of catastrophic motor vehicle accidents, exactly like the one that happened. (SAF at ¶ 45).

Still, even if this Court imposed the heightened intent-to-harm standard, Officer Richers' conduct should still be found to shock the conscience because his actions demonstrate an intent to harm. *See Lewis*, 523 U.S. at 854 (explaining that high speed chases with an intent to harm suspects physically or to worsen their legal plight gives rise to potential liability under the Fourteenth Amendment, redressable by action under § 1983). In *Clark v. Merrell*, Judge Surrick of this District Court found that an intent-to-cause harm could be inferred from a defendant police officer's dangerous pursuit of a suspect on a dirt bike in defiance of a supervisor's order, earlier in the day, not to pursue dirt bikes. No. CV 19-1579, 2021 WL 288791, at *5 (E.D. Pa. Jan. 28, 2021). Undeterred by the supervisor's order, the police officer defendant pursued a suspect on a dirt bike for eight to ten minutes, at 60 miles per hour, in the middle of the afternoon, near a major transportation center, and through densely populated areas with clearly marked pedestrian crosswalks. *Id.* There was no urgency to pursue the suspect, and the chase resulted in injuries to the uninvolved plaintiffs when the dirt bike crashed into them. *Id.*

Judge Surrick found a dangerous and unauthorized pursuit could support an inference that the police officer defendant acted with the requisite intent to harm. *Id.* (citing *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 301-02 (D. Md. 2020) (finding that plaintiffs had plausibly alleged a purpose to cause harm where, "without observing any suspicious or ongoing criminal conduct," officers intentionally misused a police vehicle to "spe[e]d after [plaintiffs] down residential streets, running stop signs in five different intersections, without ever activating their vehicles' emergency equipment"); *McGowan v. Cnty. of Kern*, No. 15-01365, 2018 WL 2734970

14

at *10, 2018 U.S. Dist. LEXIS 96236 at *28-29 (E.D. Cal. June 7, 2018) (finding that plaintiff had plausibly alleged a purpose to cause harm where officer drove through "an intersection against a red light travelling at 85 miles per hour" even though there was no "necessity and urgency" that the officer respond to the call in this manner and there was "virtual certainty that he would kill someone and for a reason other than a legitimate law enforcement objective.")). The same inference is warranted in this case, as Officer Richers' conduct suggests only that this pursuit was virtually certain to kill or injure someone (which it did) for a reason other than a legitimate law enforcement objective. Indeed, the pursuit was plainly unauthorized by Collingdale's vehicle pursuit policy and Pennsylvania's law governing the use of emergency vehicles. (SAF at ¶ 111).[1]

At minimum, as the parties' statement and counterstatement demonstrate, the material facts bearing on whether Officer Richers' conduct was conscience-shocking are genuinely disputed. Because a reasonable jury could conclude that Richers' conduct was conscience-shocking under either or both the "hurried deliberation" (conscious disregard of a great risk of serious harm) and the "hyper pressurized environment" (intent to harm) standard, summary judgment is unwarranted. *See, e.g.*, *Estate of Smith v. Marasco*, 318 F.3d 497, 510 (3d Cir. 2003) (reversing summary judgment on state-created danger claim where material facts bearing on unconstitutionality of officers' conduct were genuinely disputed); *Arnold v. City of Philadelphia*, 151 F. Supp. 3d 568, 578 (E.D. Pa. 2015) (state-created danger claim could proceed to trial because plaintiff "presented sufficient evidence such that a reasonable jury could find that defendants' actions shock the

---

[1] Defendants also offhandedly argue in a footnote that Plaintiff Kristyanna Dellavecchia cannot recover under the 14th Amendment claim, because she was not in the car struck by Mr. Jones. There is no basis for this position.  As addressed in detail *supra*, Ms. Dellavecchia was in the vehicle immediately behind her sisters and witnessed the crash and immediate aftermath.. (SAF at ¶¶ 97,98). Ms. Dellavecchia watched her sister die. Unsurprisingly, she sustained intense emotional and psychological damages. She is an appropriate plaintiff for her own damages in this matter.

conscience"); *accord D.M. ex rel. J.M. v. Cnty. of Berks*, 27 F. Supp. 3d 594, 604 (E.D. Pa. 2014)
(Baylson, J.) (same for substantive due process claim where "[a] reasonable jury could find" that
defendants' conduct "shock[ed] the conscience").

> **B.      Officer Richers Is Not Entitled to Summary Judgment Based on Qualified
> Immunity.**

Qualified immunity "protects government officials 'from liability for civil damages insofar
as their conduct does not violate clearly established statutory or constitutional rights of which a
reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting
*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Two interests are balanced by the rule: "the need
to hold public officials accountable when they exercise power irresponsibly and the need to shield
officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

A qualified immunity analysis requires consideration of two concepts. "First, a court must
decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional
right." *Pearson*, 555 U.S. at 232. "Second, if the plaintiff has satisfied this first step, the court must
decide whether the right at issue was 'clearly established' at the time of defendant's alleged
misconduct." *Id.* The second prong is met when it would be "clear to a reasonable officer that his
conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).
That does not require a prior precedent with indistinguishable facts, "but existing precedent must
have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S.
731, 741 (2011). Existing precedent is sufficient to place a constitutional question beyond debate
and to defeat qualified immunity if it is "controlling authority in [the relevant] jurisdiction," *Wilson
v. Layne*, 526 U.S. 603, 617 (1999), or if "a 'robust consensus of cases of persuasive authority' in
the Court of Appeals" has settled the question, *Mammaro v. N.J. Div. of Child Prot. &
Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (internal quotations omitted).

Additionally, when a defendant asserts qualified immunity at summary judgment, "two supervisory rules" prescribed by the Third Circuit inform a district court's resolution of that immunity claim. *Minor v. Delaware River & Bay Auth.*, 70 F.4th 168, 174 (3d Cir. 2023). First, a district court is "require[d] . . . 'to specify those material facts that are and are not subject to genuine dispute and explain their materiality.'" *Id.* (quoting *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 146 (3d Cir. 2002)). Second, the court is "require[d] . . . to 'analyze separately, and state findings with respect to, the specific conduct of each [defendant].'" *Id.* (quoting *Grant v. City of Pittsburgh*, 98 F.3d 116, 126 (3d Cir. 1996)).

Here, defendants argue that summary judgment should be granted as to Officer Richers because, even assuming a right was violated, the right was not a clearly established right at the time of the pursuit and thus qualified immunity offers protection. An initial problem with this argument is that Defendants skip a key step in the analysis and fail to identify the constitutional right that was, purportedly, not clearly established. On this basis alone, summary judgment should be denied.

Still, in *Sauers v. Borough of Nesquehoning*, the Third Circuit did identify the at-issue right as "**the right to be free of the risk associated with a non-emergency but reckless police pursuit.**" 905 F.3d at 719 (emph. added). Indeed, the Court in *Sauers* **in 2018** was unequivocal:

> **Police officers now have fair warning that their conduct when engaged in a high-speed pursuit will be subject to the full body of our state-created danger case law**… when there is no compelling justification for an officer to engage in a high-speed pursuit and an officer has time to consider whether to engage in such inherently risky behavior, constitutional liability can arise when the officer proceeds to operate his vehicle in a manner that demonstrates a conscious disregard of a great risk of serious harm.

*Id.* at 722 (*emphasis added*).

With Third Circuit precedent firmly in place at the time of the pursuit, the right was clearly established at the time of Officer Richers' conduct. *See Wilson*, 526 U.S. at 617 (holding the presence of existing precedent is sufficient to place question of a clearly established right beyond debate). Stated differently, at the time of the **July 16, 2020** pursuit, police officers, like Officer Richers, could be liable for vehicle pursuits undertaken with a conscious disregard of the great risk of harm, absent a compelling justification for the pursuit, where the officer had at least some time to consider whether to engage in inherently risky behavior. *Sauers*, 905 F.3d at 723.

Here, Officer Richers' conduct is analogous to the conduct of the officer in *Sauers*, and thus, qualified immunity offers no protection for his violation of Plaintiffs' clearly established constitutional rights. As noted *supra*, Officer Richers had ample time to deliberate before he engaged in a reckless, non-emergency pursuit. Prior to the collision with Mr. Munafo's vehicle there was no pressing need to arrest Jones for suspected traffic violations and the collision with Officer Lyon's vehicle cannot form the basis for a qualified immunity defense because occurred it during the course of a pursuit that was already constitutionally violative.

In the alternative, if this Court finds *Sauers'* "conscious disregard" standard inapplicable to Officer Richers' pursuit of Jones, Supreme Court precedent clearly establishes that a police pursuit of a dangerously fleeing suspect may give rise to a 14th Amendment constitutional violation where there is intent to harm. *Lewis,* 523 U.S. at 835; *Davis*, 190 F.3d at 171. As discussed above, and, as explained in *Clark v. Merrell*, a permissible inference of intent to harm can be drawn when, as is the case here, there is virtual certainty that death or injury would result from a pursuit unrelated to any legitimate government interest. *See Clark*, No. CV 19-1579, 2021 WL 288791, at *5 (denying defendant police officer's motion to dismiss based on qualified immunity when considering a police pursuit that resulted in injuries to uninvolved parties under

an intent-to-harm standard where a permissible inference of intent could be drawn based on the defendant's conduct).  Therefore, under either standard, the constitutional violations committed by Officer Richers were clearly established at the time of the improper July 16, 2020 pursuit and preclude summary judgment.

Moreover, there are numerous factual disputes that remain about the events giving rise to Officer Richers' claim of qualified immunity. Under such circumstances, this Court has repeatedly withheld ruling on qualified immunity defenses until factual disputes are resolved after a trial on the merits. *See Tinch v. Lazaro*, No. CV 20-5563, 2022 WL 1694181, at *4 (E.D. Pa. May 26, 2022) (Baylson, J.) (denying summary judgement in civil rights claim on basis of qualified immunity where factual disputes remain about the events giving rise to the claim of immunity); *Garey v. Borough of Quakertown*, No. 12-CV-0799, 2013 WL 3305222, at *6 (E.D. Pa. July 1, 2013) (Baylson, J.) (reviewing excessive force cases denying summary judgment on the basis of qualified immunity where factual disputes remained about the events giving rise to the claim of immunity). At minimum, a qualified immunity analysis cannot be resolved in favor of Defendants before a full trial on the merits can establish the facts necessary for the Court to resolve the issue.

    **C.**    **Summary Judgment Should Be Denied as to the *Monell* Claims Against Collingdale, as Triable Issues of Fact Exist as to Whether Collingdale's Policies, Customs, Practices and Failure to Train Resulted in the Deprivation of Plaintiffs' Constitutional Rights**

A section 1983 claim against a municipality may proceed in two ways. *Estate of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019). A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, *id.* at 798 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)), or that they were caused by a failure or inadequacy by the municipality that "reflects a deliberate or conscious choice," *id.* (internal quotation marks omitted) (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001)).

The latter avenue arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its police officers. *Id.* at 798–99.

There is no constitutionally violative written policy at play here. Instead, the theories of liability are twofold: **an unwritten municipal policy or custom theory <u>and</u>, separately, a failure or inadequacy theory**. *See Forrest v. Parry*, 930 F.3d 93, 105–06 (3d Cir. 2019) (recognizing these distinct theories). Plaintiffs that proceed under a municipal policy custom theory must make showings that are not required of those who proceed under a failure or inadequacy theory, and vice versa. *Id.* Notably, an unconstitutional municipal policy or custom is necessary for the former theory, but not for the latter, failure or inadequacy theory. *Id.* at 798 ("[F]or failure-to-train claims ...[,] a plaintiff need not allege an unconstitutional policy.") (citing *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997)). A plaintiff presenting an unconstitutional policy must point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy[2] on the relevant subject or, if alleging a custom, the plaintiff must evince a given course of conduct so well-settled and permanent as to virtually constitute law. *Id.* On the other hand, one whose claim is predicated on a failure or inadequacy has the separate requirement of demonstrating a failure or inadequacy amounting to deliberate indifference on the part of the municipality. *Id.*

### 1.     Collingdale Had a *De Facto* Custom of Allowing Officers to Recklessly Pursue Suspects Over Summary Offenses

---

[2] Here, there is most certainly a triable issue of fact as to who that decisionmaker was with respect to Collingdale. While Defendants note that Collingdale's mayor is the chief law enforcement officer for the Borough, Collingdale Police Chief Kenneth Felker, speaking as the 30(b)(6) designee for the Borough of Collingdale, said that he, meaning Collingdale in context of a 30(b)(6), did not know whether the mayor had final policy authority over the policies that he has authored on behalf of the Borough. (SAF at ¶ 128). Moreover, Felker admitted that, during his tenure, the mayor has never exercised authority over police policy or training.  (SAF at ¶ 129).

A theory of liability based on custom requires showing that the custom was the proximate cause of the injuries. *See Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996). This may be done by demonstrating an "affirmative link" between the custom or practice and the particular constitutional violation. *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (internal quotation marks omitted). "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *See Black v. Stephens*, 662 F.2d 181, 190–91 (3d Cir.1981), *cert. denied*, 455 U.S. 1008 (1982).

Since at least 2013, there was a custom at the Borough of Collingdale Police Department to engage in inherently dangerous vehicle pursuits to apprehend suspects for summary and minor offenses, despite the risk of great harm this posed to members of the general public. Collingdale is a tiny Borough, consisting of just one square mile, and its police force is small, consisting of just 15 to 20 police officers at the time of the incident.  Nevertheless, between the January 1, 2013 and July 16, 2020, its police department was involved in at least 26 police vehicle pursuits. Of that number, at least 21 were initiated over summary offenses (15), suspected non-violent/property crimes (5), and, remarkably, on one occasion for the sound of spinning tires. Many of these pursuits continued despite dangerous driving until a crash occurred, and at least nine resulted in personal injuries and/or property damage.

The sheer number of pursuits occurring in Collingdale creates a triable issue of fact as to whether it engaged in an unconstitutional custom. Viewing the facts in Plaintiffs' favor, a reasonable trier of fact could infer that: (1) policymakers/decisionmakers (Chief Felker, former Chief Adams, and/or the mayor) were aware of the number of pursuits, (2) police officers believed they were permitted to engage in high-speed pursuits over minor offenses or, indeed, sometimes, absent any identifiable offense; and (3) officers believed that injuries to innocent bystanders were

justified to apprehend those suspected offenders.  Accordingly, this custom clearly led to a state-created danger and unconstitutional violation of the rights of bystanders to these chases

Moreover, there is no evidence demonstrating that any Collingdale police officer was ever disciplined over a vehicle pursuit. Accordingly, it is reasonable to infer that their conduct during pursuits was sanctioned and condoned by the police department, as part of an untoward, unofficial custom of permitting officers to, essentially, run wild during pursuits. Indeed, at trial, Plaintiffs' expert, Paul M. Pazen, will testify that the pursuits Collingdale routinely engaged in were wholly incompatible with modern law enforcement principles, which focus on avoiding unnecessary vehicle pursuits due to the inherent associated risk of harm.

Moreover, Collingdale has failed to report vehicle pursuits to the Commonwealth of Pennsylvania, as required by law since 1996. (SAF at ¶ 153). Rather, the evidence suggests that Collingdale deliberately chose to ignore its reporting requirement. It is known that: (1) Chief Felker felt the reporting system was deeply flawed; (2) forms existed within the police department that were designed to assist officers with their electronic pursuit reporting requirements; and (3) the Pennsylvania State Police confirmed that Collingdale did not report a single pursuit to their office between January 1, 2013 and December 31, 2020. Rather, despite being aware of their obligation to report, the first instance of pursuit reporting by Collingdale occurred approximately one year after the July 16, 2020 pursuit of Anthony Jones. (SAF at ¶¶ 145-147, 149, 153). A reasonable trier of fact could infer that this presents evidence Collingdale's desire to continue its custom of engaging in dangerous police pursuits without any oversight or accountability. There is a clear nexus between this improper custom and the constitutional violations suffered by Plaintiffs.

In sum, under an unconstitutional custom theory of liability, Plaintiffs' *Monell* claim survives summary judgment. There are genuine disputes of material fact regarding the existence

of Collingdale's unconstitutional custom of dangerous pursuits of summary or minor offenders. A reasonable jury could find not only that Collingdale had such a custom, but that a causal nexus existed between the custom and Plaintiffs' harms.

### 2. Collingdale's Failure to Train, Supervise, or Discipline Police Officers on Vehicle Pursuits and the Borough's Pursuit Policy Amounts to Deliberate Difference

Under an inadequacy theory, it is not necessary to point to an official proclamation, policy, or edict, nor a specific policymaker possessing final authority. *Thompson v. City of Phila.*, No. CV 20-3134, 2022 WL 17364640, at *3 (E.D. Pa. Dec. 1, 2022) (Baylson, J.). Instead, a plaintiff must demonstrate deliberate indifference by policymakers. *Id.* Identifying the specific policymakers is not a requirement. *Id.* (citing *Parkell v. Danberg*, 833 F.3d 313, 338 (3d Cir. 2016) (holding that deliberate indifference can be attributed to unnamed municipal policymakers who "turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights.")).

A municipality can be liable under "section 1983 and the Fourteenth Amendment for a failure to train its police officers with respect to high-speed automobile chases, even if no individual officer participating in the chase violated the Constitution." *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994). "The [municipality] is liable under section 1983 if its policymakers, acting with deliberate indifference, implemented a policy of inadequate training and thereby caused the officers to conduct the pursuit in an unsafe manner and deprive the plaintiffs of life or liberty." *Id.* Under extraordinary circumstances, even a single incident can implicate municipal liability where "the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations." *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 628

(E.D. Pa. 2015). Where the policy or custom does not facially violate federal law, causation can be established only by demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequences. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).

Here, Collingdale failed to train, supervise and discipline its officers, investigators, supervisors and even command staff on vehicle pursuits or its vehicle pursuit policies.[3] (SAF at ¶¶ 117-127).  According to Chief Kenneth Felker, whose testimony was stipulated to be both fact and designee testimony, when a new pursuit policy was issued in 2019 due to the need for one, as part of a much larger new policy handbook, the policy was not individually disseminated to officers. (SAF at ¶ 117). Instead, Collingdale's "IT guy" put a file on everybody's computer desktop that contained all of the 140-150 new policies and procedures. (SAF at ¶ 118). The Department has 8 computers in total (split amongst various individual offices and the squad room) for a department of 15-20 police officers (in July 2020) and when an officer logged into the system, there was a shared folder on the desktops containing the policies. (SAF at ¶ 119).

With respect to ensuring that his officers actually read the 150 new policies, Chief Felker testified that he did not sit with officers to go over any of the 150 policies; he did not ask his officers if they had reviewed the new policies; he did not ask his sergeants or corporals to confirm that the officers had reviewed the policies. (SAF at ¶¶ 117-127).  He did not take any steps to provide the officers with additional time, when they were not on shift, to review the policies. (*Id.*). He merely "assumed" each officer read the 150 policies contained in the new handbook. (SAF at ¶ 122).

---

[3] Collingdale appears to rely on cases in which no prior similar incidents put the municipality on notice of the need for additional training. *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 63 (2011). Collingdale ignores that here, the record reveals a pattern of prior dangerous pursuits of summary or minor offenders, several of which resulted in injuries to persons and property. (SAF ¶¶ 138-139).

With respect to training, Chief Felker testified that he did not order that his officers be trained on the new pursuit policy. (SAF at ¶ 123). When asked if he had ever ordered that his officers receive training in safe driving tactics, he replied, "The officers receive that in the police academy under their EVOC training." (SAF at ¶ 124). When pressed on his specific orders for Collingdale officers to have recurring training on pursuits, he stated, "No. It's not required." (SAF at ¶ 124). When confronted with his own policy, which states that **all Collingdale officers who drive police vehicles will be given initial and recurring training in safe driving tactics**, Felker testified that "reading" constituted training because "**professional college-educated people can train themselves.**" (SAF at ¶ 126). He agreed no **"recurring training" on vehicle pursuits or safe driving tactics had ever occurred**. (SAF at ¶ 127).

There was also no post-incident review following vehicle pursuits identified by Collingdale. (SAF at ¶ 138-139). This is true despite the fact that, at minimum, Pennsylvania requires reporting the details of pursuits to the State Police, which in theory would amount to some level of review. But Collingdale simply ignored its obligation to report.  (SAF at ¶ 140, 155 - 156).

As there was also no record of pursuits being supervised at Collingdale, there remains a triable issue of fact as to whether anyone was properly supervising the pursuit of Anthony Jones. When asked if Sargent Baker (Darby's on-duty supervisor) was supervising the pursuit, Defendant Officer Lynch replied, "Not to my knowledge. No." (SAF at ¶ 83). When asked if anyone from Collingdale was supervising the pursuit, Officer Lynch replied, "Not to my knowledge." (SAF at ¶ 84). No officer identified themselves on the radio as the pursuit supervisor. (SAF at ¶ 85). No officer provided Officers Richers or Lynch, or any of the other officers in the pursuit convoy, any orders or commands with respect to the pursuit at all. (SAF at ¶ 86). Indeed, the pursuit convoy even passed a Collingdale shift supervisor, Sargent Mark Finley. Rather than terminate the pursuit,

Finley joined the convoy, which was traveling at a high rate of speed, with some of the police vehicles driving in the middle of the road. (SAF at ¶ 90,92).

A reasonable jury could find that such failures of training, supervision, and discipline amounted to deliberate indifference to the rights of persons with whom Collingdale police officers come into contact. Thus, under an inadequacy theory of liability, Plaintiffs' *Monell* claim again survives summary judgment. *See, e.g.*, *McDaniels v. City of Philadelphia*, 234 F. Supp. 3d 637, 653 (E.D. Pa. 2017) (denying summary judgment where genuine issues of material fact existed regarding whether city's failure to train amounted to deliberate indifference).

### D.    Plaintiffs' State Law Negligence Claims (Counts III and V) Are Not Barred By Governmental or Official Immunity

Plaintiffs' state law negligence claims, raised in Counts III and V of the Complaint do not fail on the basis of purported governmental and official immunity, as there are clear, recognized exceptions to immunity in this instance. The necessary elements for a negligence claim under Pennsylvania law are "a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; a failure to conform to the standard required; a causal connection between the conduct and the resulting injury; and the actual loss or damage resulting to the interest of another." *Matthews v. Konieczny,* 515 Pa. 106, 527 A.2d 508, 511–12 (1987) (*internal quotation marks and citation omitted*).

Under the Pennsylvania Political Subdivision Tort Claims Act, local agencies are generally not liable "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person," unless the conduct falls within statutorily recognized exceptions. One such exception is where the negligence occurs in "[t]he operation of any motor vehicle in the possession or control of the local agency" and caused by "the

negligent acts of the local agency or an employee thereof acting within the scope of his office or duties." 42 Pa. C.S.A. §§ 8541 and 8542(a)–(b).

The vehicle exception also contains an exception to the exception, which prevents those who flee from or aid those fleeing from police from recovering for injuries brought upon by a police officer's operation of a vehicle in the course of attempting to stop or apprehend fleeing wrongdoers. *Id.* The purpose of this language is to weed out wrongdoers from innocent bystanders injured in police pursuits and assure that wrongdoers do not get the benefit of the Commonwealth's tort protection for actions that may have endangered police officers and the public. *Lindstrom v. City of Corry,* 763 A.2d 394, 398 n. 3 (Pa. 2000) (*citing* Pennsylvania Legislative Journal–House, June 29, 1995, Reg. Sess. No. 60 at 1784).  In explaining this distinction, the court explain:

> [W]e believe the specific delineation of these two categories within the vehicle exception suggests that the General Assembly did not intend to remove all parties injured by the negligent operation of a police vehicle during a police pursuit from the class of individuals able to recover under the Tort Claims Act, but rather for innocent bystanders to remain eligible to recover from a local agency and its employees, if injured during a police pursuit due to the negligent operation of a vehicle in the possession or control of the local agency.

*Cornelius v. Roberts,* 71 A.3d 345, 350 (Pa. Commw. 2013).

Here, Defendants simply ignore well-pleaded allegations and the factual record to suit their argument. They suggest, without basis, that "[a]ll of the negligence claims in this case involve negligent decision making and none involve the operation of a motor vehicle or negligence operation outside of the privileges extended to Emergency Vehicle Operators in Pennsylvania." Putting aside the fact that the entire incident, and thus the Complaint, centers on the Defendant Police Officers' improper use of vehicles to engage in a dangerous and unjustified pursuit, there are several allegations in Counts III and V that speak directly to Municipal Defendants' negligent, careless and reckless operation of motor vehicles. For example, and directly contrary to

Defendants' claim that there is "no averment that Officer Richers was not using lights and sirens", Plaintiffs' allege Officer Richers and Collingdale, through its agent Officer Richers, were negligent, careless and reckless in "**[f]ailing to use all auditory and visual alert systems,** including vehicle horns, at the Police Officer Defendants' disposal to alert other vehicles nearby, including the vehicles that Plaintiffs were travelling in, of the pursuit." (Compl. at ¶¶ 107, 120). **And this proved true during discovery — Richers and Lynch both admit that they did not use their sirens throughout the pursuit**. (SAF at ¶¶ 61,87). Instead, **Richers activated his sirens for a total of 3 seconds** and Lynch made occasional use of his Yelp horn. (SAF at ¶ 87). This was a failure to communicate with the members of the public, and both Officer Richers and McCauley admit that effective communication during a vehicle pursuit is important. (SAF at ¶¶ 87-89). Finley admitted that communication with members of the public is essential, and sirens are used to alert the public. (SAF ¶ 89). McCauley admitted that communication includes the use of sirens to alert innocent bystanders. (*Id.*). Therefore, at minimum, a triable issue of fact exists as to whether these meager efforts by Richers and Finley were sufficient.

Moreover, specific to the issue of vehicle control and contrary to Defendants' argument that the Complaint contains only instances of negligent decision making, there are allegations that Officer Richers (1) failed to keep a proper lookout on the roadway; (2) drove at excessive speeds; (3) operated his police vehicle without due regard to the rights, safety, and position of surrounding vehicles; (4) failed to follow, adhere to, and apply police department policies and guidelines regarding pursuits during the pursuit; and (5) violated the statutes of the Commonwealth of Pennsylvania governing the operation of motor vehicles on streets and highways. *Id.* **The factual record establishes triable issues of fact as to each of these categories.  Richers disregarded steady red traffic signals, drove at 82-mph, and operated his vehicle in a way that violated**

**Collingdale's pursuit policy and Pennsylvania law.**  (SAF at ¶ 76). Therefore, the record is more than sufficient to bring a negligence claim against Officer Richers and, under a *respondeat superior* theory of vicarious liability, Collingdale to trial.

However, Plaintiffs acknowledge the general rule that a municipality and its employees share co-extensive liability. *See* 42 Pa. C.S.A. § 8545. In that regard, Plaintiffs do not seek double recovery to the extent Counts III and V are duplicative causes of action for the same **negligent conduct and have agreed to stipulate to same**. That said, the prohibition against affixing greater liability upon a municipal employee then attaches to his employer, is abrogated when "it is judicially determined that the act of the employee caused the injury and that such action constituted a crime, actual fraud, actual malice or willful misconduct. . . ." 42 Pa. C.S.A. § 8550. Here, there is ample evidence that would allow jury to find that the entirety of Richers malfeasance constitutes willful misconduct. In the face of such a finding, the would be a waiver of Section 8545's official immunity provision. *See Lopuszanski v. Fabey*, 560 F.Supp. 3 (E.D. Pa. November 18, 1982); *Overstreet v. The Brgh. of Yeadon*, 475 A.2d 803 (Pa. Super. 1984). For example, and specific to Count III, Plaintiffs' allegation that Officer Richers violated the statutes of the Commonwealth of Pennsylvania governing the operation of motor vehicles on streets and highways, which was established during discovery, may amount to intentional or willful conduct. (Compl. at ¶ 107). Richers admits that he was not concerned with red traffic signals, which a jury may find to be a willful violation of the law. (SAF at ¶ 19). This is especially true because Richers did not use his siren during the length of the fatal pursuit. (SAF at ¶ 19). Had he or Lynch used it for the entirety of the pursuit, then Matthew would have been alerted to the presence of pursuit before entering Oak Lane's intersection with MacDade Boulevard. (SAF at ¶ 61). As both Federal and Pennsylvania rules of civil procedure specifically provide for the alternative and inconsistent

pleading of causes of action, Plaintiffs should be permitted to test these theories at trial before the finder of fact. Fed. R. Civ. P 8(d)(2); Pa. R.C.P. 1020(c); Standard Pennsylvania Practice, § 16:59.

E.     **Plaintiffs' Reckless Disregard of Safety Claim (Count IV) Against Officer Richers Alleges Willful Conduct Distinct from Allegations of Negligence**

Count IV of the Complaint contains allegations of intentional and willful conduct by Officer Richers that are distinct from, and alleged in the alternative to, the allegations of negligence contained in Count III. Compl. at ¶¶ 112, 115. While Pennsylvania does not recognize an independent tort of recklessness, it does recognize the principles of the Restatement (Second) of Torts § 500. *See Krivijanski v. Union Railroad Co.*, 515 A2d 933 (Pa. Super. 1986) (discussing Section 500 while holding comparative negligence principles are inapplicable to reckless conduct and explaining "[o]ur primary reason for so holding is that the longstanding distinction Pennsylvania courts have made between willful or wanton conduct and negligent conduct."). In *M.U. v. Downingtown High Sch. E.*, which involved section 1983 claims stemming from an injury to a student athlete and, like the case here, involved supplemental state law claims alleged through separate counts of negligence and recklessness, the Hon. Gerald J. Pappert of this District Court evaluated the sufficiency of both claims. 103 F. Supp. 3d 612, 629 (E.D. Pa. 2015). Judge Pappert correctly noted that recklessness is a heighted standard of care required to potentially recover punitive damages. *Id.* Judge Pappert noted that, while claims of negligence and recklessness should be evaluated together, the Tort Claims Act's official immunity does not extend to an employee's individual liability for acts of willful misconduct. *Id.* at 630 (citing *Wade v. City of Pittsburgh*, 765 F.2d 405, 412 (3d Cir.1985) ("In this case the complaint clearly alleges conduct . . . amounting to 'willful misconduct.' Thus, there was no cause of action for which the city's immunity would be extended to an employee under § 8542.")).

Plaintiffs initiated this suit against Officer Richers in his individual capacity and as a police officer for Collingdale. As discussed above, there is ample evidence for a jury to conclude that Officer Richers engaged in intentional and willful misconduct. If proven at trial, the allegations contained in Count IV of the Complaint would result in Officer Richers' individual liability for intentional and willful misconduct. Defendants fail to provide a justification for excusing Officer Richers of individual liability for conduct that is suggestive of punitive damages, and thus dismissal of Count IV is improper.

### F.   The At-Issue Wrongful Death and Survival Claims (Counts VII and VIII) Are Valid Claims Governed by the Tort Claims Act

Christina Donahue brings Counts VII and VIII, respectively wrongful death and survival claims, as the administratrix of Angel's Estate. The claims arise under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301, and the Pennsylvania Survival Act, 42 Pa. C.S. § 8302. Both claims sound in tort and are governed by the Tort Claims Act in this instance because the Defendants are municipalities and their respective police officers. It would be improper and manifestly unjust to dismiss these claims and leave Angel's Estate without recourse where, as has already been discussed in detail, Christina's wrongful death and survival claims fall within the vehicle liability exception to the Tort Claim's Act. *See Costobile-Fulginiti v. City of Philadelphia*, 719 F. Supp. 2d 521, 525 (E.D. Pa. 2010) (dismissing plaintiff's wrongful death and survival claims only after concluding that the exceptions to Tort Claims Act immunity provision were not applicable); *Marks v. Philadelphia Indus. Corr. Ctr.*, No. CIV.A. 14-5168, 2014 WL 5298008, at *4–5 (E.D. Pa. Oct. 15, 2014) (same); *Sullivan v. Warminster Twp.,* No. 07–4447, 2010 WL 2164520, at *6 (E.D. Pa. May 27, 2010) (same).

### G.   The Present Emotional Distress Claims Fall Within the Tort Claim Act's Vehicle Exception

Defendants cite no case law or statutory authority supporting their argument that claims for emotional distress are "not cognizable under the Tort Claims Act". Doc. No. 5, at 23. Emotional distress claims are properly evaluated under the Act and on this basis alone Defendants' motion should be denied. *See e.g., Regan v. Twp. of Lower Merion*, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999) (denying, in part, motion to dismiss plaintiff's supplemental emotional distress claims in section 1983 action where the defense argued that such claims were barred by the Act); *see also*, *United States v. Benish,* 5 F.3d 20, 26 (3d Cir.1993) (rejecting a party's claim where the party "provid[ed] no legal support for his argument or any persuasive reason" for the court to find in his favor). Here, the evidence clearly establishes that Kristyanna's emotional and physical injuries stem involvement in a motor vehicle accident. (SAF at ¶¶ 97, 98) She was witnessed the collision and was in the same intersection as her sister when she died. (*Id.*)

The evidence suggests only that her life has been torn apart from witnessing the Angel's death. Therefore, the same reasons that warrant finding Officer Richers is not entitled to official immunity support allowing Kristyanna's claim for negligent infliction of emotional distress to proceed to trial. Moreover, the same facts that suggest willful and intentional misconduct also support permitting her claim for intentional infliction of emotional distress to proceed to trial. Viewed in Plaintiffs' favor, it is clear from the record that all of Kristyanna's injuries are a direct result of the police officer Defendants' improper conduct, which caused the underlying, at-issue motor vehicle collision. As a result, Defendants' Motion should be denied.

## H.    The Tort Claims Act Does Not Preclude Plaintiffs' Municipal Liability Claim (Count VI) Because The Vehicle Liability Exception Applies.

Defendants do not argue that Count VI should be dismissed. Still, to the extent the Court wishes to consider it, there is no basis for dismissing the entirety of Count VI of Plaintiffs' Complaint, as Defendants' suggest, where allegations contained therein easily fit within the motor

vehicle exception to the Tort Claims Act. In order to come within the motor vehicle exception to sovereign immunity, the damages claimed must have arisen from the operation of a vehicle by a Commonwealth party. *North Sewickley Tp. v. LaValle,* 786 A.2d 325 (Pa. Commw. Ct. 2001). "Operation" of a vehicle, in the context of the Tort Claims Act, reflects a continuum of activity which entails a series of decisions and actions, taken together, that transport the individual from one place to another; the decisions of where and whether to park, where and whether to turn, whether to engage brake lights, whether to use appropriate signals, whether to turn lights on or off, and the like, are all part of the operation of a vehicle. *Williams v. City of Philadelphia Office of Sheriff,* 2020 WL 315594 (E.D. Pa. 2020); *Hernandez v. Independence Tree Service LLC,* 2019 WL 1773374 (E.D. Pa. 2019); *Balentine v. Chester Water Authority,* 191 A.3d 799 (Pa. 2018).

For example, in *Hernandez v. Independence Tree Service LLC,* the plaintiff, a tree service subcontractor, was working near and under train tracks when he was struck by a train owned and operated by defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") and severely injured. 2019 WL 1773374 at *2. (E.D. Pa. 2019). The Plaintiff contended that SEPTA failed to timely alert him regarding the approaching train, and brought claims alleging failure to train, hire, supervise, and communicate with employees and contractors regarding the time and location of work being done at the accident site. *Id.* This District Court denied SEPTA's motion to dismiss insofar the allegations centered on alleged failures to communicate, and explained that communications intended to ensure the railway was clear and to alert works of the approaching trains fit under the Pennsylvania Supreme Court's broad interpretation of safely operating of a vehicle and thus the motor vehicle exception to the Tort Claims Act. *Id.* (citing *Balentine,* 191 A.3d at 809).

Here, like *Hernandez*, Plaintiffs' direct state law negligence claims against Collingdale relate specifically to failures to communicate in the context motor vehicle operation. As addressed at length *infra,* the Municipal Defendants' had a responsibility to (1) intervene and terminate the pursuit as it was ongoing; (2) provide necessary vehicles and equipment to the Police Officer Defendants to ensure that the at-issue pursuit was safe and effective; (3) ensure effective communications during the pursuit; and (4) maintain control of the pursuing vehicles during the pursuit.  Here, Collingdale failed to comply with any of these duties. These failures, among others, caused the accident that injured and killed Plaintiffs. Accordingly, Plaintiffs' Municipal Liability Claim (Count VI) is a viable claim and must be permitted to proceed to trial.

### CONCLUSION

For the reasons set forth herein, this Honorable Court should deny the Motion for Summary Judgment of Defendants Borough of Collingdale and Officer Collin Richers.

Respectfully submitted,

Dated: November 20, 2023

*/s/ Elizabeth A. Bailey*
Elizabeth A. Bailey
Steven A. Medina
Grant & Eisenhofer
123 Justison Street
Wilmington, DE 19801
302-622-7086
ebailey@gelaw.com
smedina@gelaw.com

*Attorneys for Plaintiffs Christina Donahue, as Administratrix of the Estate of Angel McIntyre, deceased, Matthew Munafo, and Kristyanna Dellavecchia*

## **CERTIFICATE OF SERVICE**

I, Elizabeth A. Bailey, counsel for Plaintiffs, state that a true and correct copy of the within Response in Opposition to Defendants Motion for Summary Judgment with supporting Brief, and Plaintiffs' Response to the Statement Of Undisputed Facts of Defendants Borough of Collingdale And Officer Colin Richers and Plaintiffs' Statement of Additional Facts In Support of Plaintiffs' Response to Defendants' Motion For Summary Judgment was served upon all parties via ECF this 20th day of November 2023.

*/s/ Elizabeth A. Bailey*
ELIZABETH A. BAILEY