**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHRISTINA DONAHUE, AS ADMINISTRATRIX OF THE ESTATE OF ANGEL MCINTYRE, DECEASED; MATTHEW MUNAFO; KRISTYANNA DELLAVECCHIA**, *Plaintiffs,* <br><br> **v.** <br><br> **BOROUGH OF COLLINGDALE; BOROUGH OF DARBY; DANTE LYNCH; JAKE LYONS, COLIN RICHERS**, *Defendants.* | **CIVIL ACTION** <br><br> **NO. 22-1695** |

<u>**MEMORANDUM RE: SUMMARY JUDGMENT**</u>

Baylson, J.                                                                                     February 1, 2024

This lawsuit stems from fatal events on July 16, 2020 in Delaware County, in the Eastern District. Anthony Jones, while fleeing police at high-speed, struck a vehicle occupied by Matthew Munafo and Angel McIntyre. Ms. McIntyre was killed on impact and Mr. Munafo was ejected from the car and suffered serious brain injury.

High-speed police pursuits, however necessary for law enforcement, also pose an incredible danger to the public. This danger is not new. In the last forty-five years over 11,500 people have lost their lives as a result of a pursuit,[1] averaging several hundred deaths per year.[2]

---

[1] Thomas Frank, *High-Speed Police Chases Have Killed Thousands of Innocent Bystanders*, USA Today, Jul. 30, 2015, https://perma.cc/5QXB-G5HD (last accessed Jan. 26, 2024).

[2] National Highway Traffic Safety Administration, *Fatality Analysis Reporting System: 2015-2020* (2020).

The need for police training and proper departmental policy is self-evident, reported,[3] and of great concern to law enforcement.[4]

At summary judgment, this Court confronts two distinct questions. First, did the officers' behavior, in choosing to engage in this high-speed pursuit, "shock the conscience? And second, regardless of officer liability, did the municipalities demonstrate deliberate indifference to the public, by allowing a custom of reckless pursuits or failing to train officers on police pursuits, that caused Plaintiffs' injuries? As to question one, the officers are entitled to summary judgment because they did not intend to harm McIntyre or Munafo while pursuing an actively fleeing suspect. However, the claims against the municipal Defendants will proceed to trial. Genuine disputes over three material facts require this decision. Because the municipalities were on notice of prior dangerous pursuits that may have violated their pursuit policies, the municipalities took no remedial action—investigation, discipline, or retraining—after these prior pursuits, and the municipalities may have failed to provide any meaningful training to their officers for when to engage in high-speed pursuits, a jury must decide if their actions, as established at a trial in this case, constituted deliberate indifference to the public's wellbeing.

## I.   PROCEDURAL HISTORY AND BACKGROUND

Plaintiffs filed suit against individual Officers Richers, Lyons, Lynch, and Boroughs Collingdale and Darby on May 3, 2022. Compl., ECF 1. They allege ten counts. Compl. ¶¶ 88–148. All Plaintiffs assert Fourteenth Amendment Substantive Due Process violations against

---

[3] Geoffrey P. Alpert & Patrick R. Anderson, *The Mostly Deadly Force: Police Pursuits*, 3 JUST. Q. 1 (1986).

[4] See, e.g., HUGH NUGENT ET AL., U.S. DEP'T OF JUST., RESTRICTIVE POLICIES FOR HIGH-SPEED POLICE PURSUITS iv (1990) (report discussing need for proper pursuit policy and training due to "major public concern"); POLICE EXECUTIVE RESEARCH FORUM, VEHICULAR PURSUITS: A GUIDE FOR LAW ENFORCEMENT EXECUTIVE ON MANAGING THE ASSOCIATED RISKS 1 (2023) (recommending pursuit policies to police chiefs and other law enforcement executives).

individual Defendants and <u>Monell</u>[5] claims against the Boroughs of Collingdale and Darby (Counts I and II).[6] <u>Id.</u> at ¶¶ 88–104. Additionally, they argue individual Defendants and Boroughs engaged in negligent, or alternatively "reckless" conduct, under Pennsylvania law (Counts III, IV, V, and VI).[7] <u>Id.</u> at ¶¶ 105–25. Finally, Plaintiff Dellavecchia argues individual officers negligently or alternatively intentionally inflicted emotional distress in causing her sister's death (Counts IX and X). <u>Id.</u> at ¶¶ 138–48.

This Court denied Defendants' Motion to Dismiss. <u>Donahue v. Borough of Collingdale</u>, 2022 WL 3577377 (E.D. Pa. Aug. 19, 2022), Extensive discovery followed.

Defendants moved for Summary Judgment on all claims.[8] Briefing and oral argument followed.

## A. <u>Summary of Oral Argument</u>

This Court heard oral argument on the pending motions for summary judgment on January 25, 2024. Counsel responded to this Court's questions, previously served, most of which pertained to the alleged liability of the individual officer Defendants. Plaintiffs continued to maintain that the individual officer Defendants had acted improperly and violated Plaintiffs' civil rights. Plaintiffs conceded that the first leg of the pursuit, discussed <u>infra</u>, was not dangerous to the public and did not contend that any individual officers intended to harm the public. This Court, having

---

[5] <u>Monell</u> refers to the Supreme Court case that established municipalities are liable for certain constitutional violations under 42 U.S.C. § 1983. <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658, 692 (1978).

[6] These claims are viable through § 1983.

[7] Decedent McIntyre's estate styles Count VII and VIII, which advance claims under Pennsylvania's Wrongful Death and Survival Act, as independent cause of action. Compl. at ¶¶ 126–37. It is well established that these statutes do not create independent claims, but are merely methods to assert legal claims that resulted in the proper plaintiff's death. <u>Mohney v. Pennsylvania</u>, 809 F. Supp. 2d 384, 389 n. 6 (W.D. Pa. 2011).

[8] Defendants point out that Plaintiff Dellavecchia, who was a bystander, but did not suffer any physical injury, joins in the constitutional and negligent driving claims that directly stem from the accident. Defs. Collingdale and Richers Mot. Summ. J. at 19, ECF 66. Because Dellavecchia was not physically injured in the accident, she cannot, as a matter of law, recover for any claims other than her emotional distress, and this Court will **GRANT** Defendants summary judgment for Counts I–VIII as to Dellavecchia.

reviewed the officers' videos of the pursuit, finds that Defense counsel's verbal summary of the video was generally more accurate than Plaintiffs counsel's description.

## II.     **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed."  Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

### III.   <u>FEDERAL CLAIMS</u>

Generally, the government is not responsible to protect citizens from third-party dangers. <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189, 196 (1989). However, the Third Circuit carved out an exception to this rule when the state or government entity or agency has taken affirmative steps to "render [an individual] any more vulnerable" to a danger. <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1205 (3d Cir. 1996) (quoting <u>DeShaney</u>, 489 U.S. at 201). Under this "state-created danger" doctrine, a substantive due process claim emerges when an individual proves:

> (1) he sustained a foreseeable and direct harm;
>
> (2) that the state action was taken with a degree of culpability that shocks the conscience;
>
> (3) a relationship with the state making the plaintiff a foreseeable victim; and
>
> (4) an affirmative use of state authority in a way that created a danger, or made others more vulnerable than had the state not acted at all.

<u>Johnson v. City of Philadelphia</u>, 975 F.3d 394, 400 (3d Cir. 2020).[9] Plaintiffs argue the pursuit was a state-created danger for which both individual officer and Borough Defendants are liable.

### A. <u>Claims Against Individual Officers</u>

The Third Circuit is no stranger to this variety of claim. Both the appellate court and many in-circuit district courts have addressed officer and government liability to bystanders during vehicle pursuits. <u>See, e.g.</u>, <u>Davis v. Township of Hillside</u>, 190 F.3d 167 (3d Cir. 1999); <u>Sauers v. Borough of Nesquehoning</u>, 905 F.3d 711 (3d Cir. 2018); <u>Thomas v. City of Philadelphia</u>, 2002 WL 32350019 (E.D. Pa. Feb. 7, 2002) (Kauffman, J.). In short, this Court writes upon well-trod principles.

---

[9] While binding law in this Circuit, the state-created danger test remains unexamined by the Supreme Court. <u>Johnson</u>, 975 F.3d at 399–400.

The analysis centers on the second prong: when does a police chase "shock the conscience?"[10] The critical question is when an officer runs afoul of the Constitution while attempting to capture a fleeing suspect.

That "level of culpability required to shock the contemporary conscience falls along a spectrum," depending on the facts of each case. Sauers, 905 F.3d at 717 (internal quotations and citations omitted). There are three potential standards, varying based on "how much time a police officer has to make a decision." Id. First, in a "hyperpressurized environment," an action cannot shock the conscience unless the officer harbored "an intent to harm." Haberle v. Troxell, 885 F.3d 170, 177 (3d Cir. 2018). Second, when the scenario allows an officer "a matter of hours or minutes" before taking action, he is liable when he "disregard[s] a great risk of serious harm." Johnson, 975 F.3d at 401 (internal quotations and citations omitted). Finally, when the officer has time to make "an unhurried judgment," the plaintiff need only show the officer acted with "deliberate indifference" to a plaintiff's rights Id. (internal quotations and citations omitted).

Under binding precedent, high-speed police chases are "hyperpressurized environments requiring a snap judgment." Id. (internal quotations and citations omitted); Davis, 190 F.3d at 170. This is so because weighing "the need to stop a suspect's flight from the law against the threat a high-speed chase poses to others demand[s] an officer's instant judgment," lest the wrongdoer escape. Davis, 190 F.3d at 170 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 853 (1998)). Thus, "[i]n the circumstances of a high-speed chase aimed at apprehending a suspected offender . . . only a purpose to cause harm unrelated to the legitimate object of arrest will" shock the conscience. Lewis, 523 U.S. at 851.

---

[10] Defendants' motions for summary judgment contest this second element of the claim. They do not attack the other three elements.

1.  **Undisputed Facts of Officers' Conduct During the July 16, 2020 Pursuit**

On July 16, 2020 at approximately one in the morning, Defendant Richers, a part-time police officer for Defendant Borough of Collingdale was on patrol in downtown Collingdale. Defs.' Collingdale and Richers Statement of Facts ¶ 30, ECF 66–1 ("Defs.' Collingdale SAF"). Collingdale is a one-square mile jurisdiction a few miles south of Philadelphia with just under 9,000 residents. Id. at ¶ 29.

Richers saw a vehicle, later determined to be driven by Anthony Jones, with a non-functioning back taillight. Richers Mobile Video Recorder 00:42–:57, Pls.' Ex. J ("Richers MVR").[11] Jones also improperly made an illegal left turn. Id. At that point, Richers activated his emergency lights to stop Jones for these summary traffic offenses. Defs.' Collingdale SAF ¶¶ 13–14.[12] Jones initially slowed, allowing Richers to see Jones and a female passenger in the back-driver's side seat. Richers MVR 1:00–:10. Richers assumed at least one other passenger was in the front passenger seat. Defs.' Collingdale SAF ¶ 79. After approximately 30 seconds, Jones came to a complete stop in the intersection of Springfield and MacDade. Richers MVR 1:10–:43.

After about 10 seconds and as the light turned yellow, Jones accelerated away from Richers. Richers MVR 1:45–2:00. Richers radioed that Jones was "taking off" on him, "not really going fast, just not stopping." Id.

Officer Defendants from Darby Borough heard Richers dispatch. Lyons Dep. 67:13–70:24, Pls.' Ex. I, ECF 79–1; Lynch Dep. 159:13–163:08, Pls.' Ex. F, ECF 77. Darby Borough is approximately the same geographic and population size as Collingdale, bordering the town to the north (i.e. closer to Philadelphia). Deposition testimony established that officers frequently

---

[11] When, as here, video evidence clearly captures many of the events, the Court may take them as true. Scott v. Harris, 550 U.S. 372, 380–81 (2007).

[12] Neither party disputes that Richers had, at minimum, reasonable articulable suspicion, if not probable cause, to stop Jones as required under law. United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006).

assisted each other with traffic stops on the border of the two Boroughs. Lynch Dep. 94:03–96:12; Lyons Dep. 67:13–68:13. When Defendant Lyons and Lynch, part-time Darby officers, heard Richers' communications about the traffic stop, they headed toward Richers' reported location. Lyons Dep. 67:13–70:24; Lynch Dep. 159:13–163:08. Throughout the ensuing chase Richers was the only officer Defendant who communicated on the radio channel. Richers MVR 1:00-4:40.

After approximately 30 seconds Jones pulled into a McDonalds, which Richers reported via radio. Richers MVR 2:05–:10. Jones stopped again, briefly, in the McDonalds parking lot. Id. at 2:28–:40. At that time, a third occupant was visible in the vehicle. Id. Richers told Jones to "stop the car" and "turn the car off." Id.

Instead, Jones quickly accelerated away from Richers, who reported that he was "taking off again through the drive-thru." Id. at 2:37–:47.

Unbeknownst to Richers, Officer Lyons had driven into the drive-thru exit in order to physically prevent Jones from exiting the parking lot. Lyons Dep. 71:10–72:12. No evidence suggests Officer Lyons received training in blockade technique. Id. at 46:02–19.

As Jones turned the corner toward the exit, he confronted Lyons' police van and a civilian car in drive-thru. Richers MVR 2:41–:52 While maneuvering between the two vehicles, Jones hit the back corner of Lyons' van. Id. Lyons was uninjured and did not feel threatened in any way by the contact. Lyons Dep. 81:12–:23. The van sustained scrapes and minor denting on the back bumper. Richers Dep. 211:19–22, Pls.' Ex. E, ECF 97. Officer Richers, when seeing the collision, radioed that Jones "just hit a [Darby] van." Richers MVR 2:47–:50.

Officer Lynch was approaching the McDonalds when he heard Richers' dispatch and saw Jones exit the parking lot onto MacDade Avenue. Lynch Dep. 169:05–171:16. Almost immediately after Jones' exit, Lynch engaged in hot pursuit behind Jones with his emergency lights

active. Richers MVR 2:50–:55. Richers followed behind Lynch. Id. Within ten seconds multiple other police vehicles joined in the pursuit. Id. at 2:50-3:00.

Officer Lynch (in the lead), Richers (directly behind Lynch), and several other officers followed Jones for the next 90 seconds. Id. at 2:50–4:20. During the pursuit, which occurred on MacDade Blvd with a 25–35 mile per hour speed limit, the officers crossed at least 20 intersections. Id.; Defs.' Darby, Lynch, and Lyons Statement of Facts ¶ 77, ECF 68–1 ("Defs.' Darby SAF"). The officers used their audio sirens at various points when crossing intersections. Richers MVR 2:50–4:20. MacDade Blvd is commercial and residential during that span, and alternates between one to two lanes in each direction at different points. Id. at 2:50–4:20

Jones sped upwards of 80 miles per hour, ran multiple red lights, and crossed over into oncoming traffic during the pursuit in order to pass civilian drivers. Defs.' Darby SAF ¶ 25; Richers MVR 2:50-4:20. Richers and Lynch mirrored Jones' actions in pursuit. Richers MVR 2:50–4:20. Then, approximately 90 seconds after leaving the McDonalds, Jones ran another red light and "t-boned" a car occupied by Angel McIntyre and Matthew Munafo. Pls.' Statement of Fact in Resp. to Defs. Darby, Lynch, and Lyons Mot. Summ. J. ¶ 96, ECF 99 ("Pls.' Darby SAF"). McIntyre died almost instantaneously from impact. Id. Munafo ejected a hundred feet into the street. Id. Kristyana Dellavecchia, McIntyre's sister, was in a car directly behind Munafo and McIntyre and saw her sister perish. Dellavecchia Dep. 51:14–52:04, Pls.' Ex. B, ECF 85–1.[13]

---

[13] Jones was prosecuted and convicted of murder for McIntyre's death. Vinny Vella, *A Delco Man Was Convicted of Killing a Teen While Fleeing from Police in 2020*, Phil Inquirer. (Mar. 3, 2020), https://perma.cc/P9TK-B9GC.



### 2.  **Disputed Facts of the Pursuit**[14]

Three dashboard cameras capture the pursuit. As such, the parties agree on much of what transpired. Still, they disagree at what point the "pursuit" begin? Defendants contend Jones' collision with Lyons' van in the parking lot triggered the pursuit. Defs. Darby, Lynch, and Lyons Mot. Summ. J. at 5, ECF 68 ("Darby Summ. J."); Defs. Collingdale and Richers Mot. Summ. J. at 4, ECF 66 ("Collingdale Summ. J."). Plaintiffs argue the "pursuit" started when Jones first stopped prior to McDonalds and then again when Jones accelerated in the parking lot but before hitting Lyons' van. Pls.' Resp. to Darby Mot. Summ. J. at 4–5, ECF 84; Pls.' Resp. to Collingdale Mot. Summ. J. at 4–5, ECF 71. Defendants point to Richers and other officers' testimony that they did

---

[14] Defendants filed two separate motions for summary judgement, and Plaintiffs filed responses to each. The motions and responses largely duplicate each other. This memorandum will not cite each motion for summary judgment and each response when the parties' positions are identical.

not perceive Jones' initial flight, because of its low speed and turn into McDonalds, as triggering a pursuit. Defs.' Collingdale SAF ¶¶ 36–37; Lynch Dep. 165:09–166:16. Plaintiffs argue Richers transmitting "he's taking off on me" and the narratives from contemporaneous police reports show the pursuit began prior to McDonalds. July 16, 2020 Collingdale Incident Report, Pls.' Ex. N, ECF 73–1; Collingdale Pursuit After Action Report, Pls.' Ex. R, ECF 73–4; Pennsylvania Police Pursuit Report, Pls.' Ex. S, ECF 73–5.

### 3.  **Application**

Plaintiffs argue the intermediate "hours or minutes" standard applies. Relying on Sauers, Plaintiffs point out that Officers Richers, Lyons, and Lynch had minutes to weigh the costs and benefits of chase before engaging in the high-speed pursuit. Pls.' Resp. to Collingdale at 12–13. According to them, the several minutes that passed between the initiation of the stop and when Jones took off in the McDonalds parking lot constituted opportunity for "hurried deliberation." Id. Richers, Lyons, and Lynch's disregard of "great risk" to the public by pursuing Jones, they argue, shocks the conscience. Id. at 10–14; Pls.' Resp. to Darby at 11–15.

This Court cannot agree. The rule is clear—an "intent to harm", not "disregard of great risk" mens rea applies to high-speed chases. See Lewis, 523 U.S. at 853–54; Fagan v. City of Vineland, 22 F.3d 1296, 1306–07 (3d Cir. 1994) (en banc) (holding that intent to harm rather than reckless or gross negligence mens rea appropriate for police pursuit cases) (cited approvingly in Lewis, 523 U.S. at 839) ("Fagan II")

Sauers did not change that rule. There, the defendant officer witnessed a Dodge Neon commit a traffic infraction. Sauers, 905 F.3d at 715. The officer radioed ahead to a neighboring jurisdiction to pull over the Dodge when it crossed into its territory. Id. But rather than wait, the officer decided to catch up to the Dodge. Id. To do so, he drove recklessly and at high speeds,

eventually crashing and killing the Plaintiff. Id. Critically, however, no evidence suggested the Dodge was aware of the officer's pursuit.[15] In other words, the pursuit was not a chase, but instead a one-sided display of reckless driving to hunt down a traffic ticket.

When choosing to use the lesser "disregard of great risk" standard, the Third Circuit delineated a two-part test. It applies to a "reckless pursuit of an individual suspected of a summary traffic offense [1] when there is no pending emergency and [2] when the suspect is not actively fleeing police." Sauers, 905 F.3d at at 717 (emphasis added). While there is genuine dispute over whether Jones' flight constituted a pending emergency, there is no doubt that Jones, unlike the Dodge in Sauers, was refusing to yield to police. But the Sauers test is conjunctive and, therefore, inapplicable when, as here, only one prong is met. As such, the well-established principle that an officer needs an intent to harm governs.[16]

There is no genuine issue of fact to show that Lyons, Lynch, or Richers intended any harm distinct from apprehending Jones. Uncontradicted deposition testimony demonstrates a singular motive to detain Jones. Richers Dep. 164:08–16, 405:18–406:16; 416:03–417:07, Lynch Dep. 123:06–124:07, 217:02–15. Moreover, none of the potential deviations from pursuit policy plausibly suggest Lyons, Richers, or Lynch intended to hurt anyone. Plaintiff's own expert agrees.

---

[15] When the Dodge arrived in the neighboring jurisdiction, the police stopped the driver and did not arrest him for any crimes, such as the state felony applicable to a driver "who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stoop." Sauers, 905 F.3d at 715 n.2; 75 Pa. Stat. and Cons. Stat. Ann. § 3733(a).

[16] The Sauers rule is not only binding, but also makes sense. An individual actively fleeing police poses a distinct and greater danger to the public than someone who simply commits a summary traffic offense.

Ironically, Defendants, likely in order to construe Officer Richers' actions as consistent with the pursuit policy, adamantly refute that the initial interaction before the McDonalds was a "pursuit." Under their own characterization, then, one could argue this situation is closer to Sauers because no active flight or pursuit was underway when Officer Richers began to follow Jones. But whether the initial action is a pursuit or not is immaterial for the Plaintiffs' claims against the officers. Following Jones to the McDonalds at low-speed and in the proper lane of traffic did not pose a great risk of harm, as Plaintiffs conceded at oral argument. The relevant leg of the pursuit, attendant with the purported "high-speed" and reckless driving that caused injury, began when Jones fled the McDonalds. At that moment, followed quickly by Jones' collision with Lyons' van, the officers had to make a snap judgment whether to continue to pursue a fleeing suspect.

In his Report, Plaintiffs' expert Paul M. Pazen, former Denver Police Chief, opines the officers disregarded a great risk of serious harm, articulating the "hurried deliberation" standard, not intent to harm. Pazen Report IV.A.i.6; iii.2, Pls.' Ex. W, ECF 98–2. And in their Complaint, Plaintiffs only allege the officers "disregarded the risk of [bystander] injuries by prioritizing the effort to apprehend" Jones. Compl. at ¶ 93. They never seriously advance any facts to show an intent to harm anyone, let alone McIntyre or Munafo.[17] Therefore, this Court will grant summary judgment for the officers on the § 1983 claims.

## B.  Monell Claims

But what of Plaintiffs' claims against the Boroughs? The Third Circuit confronted a near-identical fact pattern three decades ago. In Fagan v. City of Vineland, the Court considered whether a municipality could violate substantive due process even when no individual officer was liable during a vehicle pursuit. 22 F.3d 1283, 1291 (3d Cir. 1994) ("Fagan I"). As here, the plaintiffs were struck and killed by a fleeing suspect in a pursuit initiated over a summary traffic offense. Id. at 1288–89. The officers were not liable because they did not intend to harm the bystander. Fagan II, 22 F.3d at 1308.[18]

But, the panel held "that in a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution." Fagan I, 22 F.3d at 1292. This is so because while an officer, faced with a snap

---

[17] This Court also finds that Officer Lyons participation was limited to the McDonalds parking. His action, plausibly stated as blocking the exit and remaining in the parking lot, is too tenuously related to the terminal crash over a mile away to satisfy causation. Jewell v. Ridley Tp., 2011 WL 5524260 at *12 (E.D. Pa. Nov. 10, 2011) (dismissing claims against officers in pursuit chase when "no facts" supported that officers' conduct "was a substantial factor in causing the accident.") (Surrick, J.) aff'd, 497 F. App'x 182 (3d Cir. 2012); Fulkerson v. City of Lancaster, 801 F. Supp. 1476, 1485 (E.D. Pa. 1992) (Van Antwerpen, J.), aff'd, 993 F.2d 876 (3d Cir. 1993) (dismissing claims against officer involved in pursuit located far from crash on lack of proximate cause).

[18] To avoid potential reader confusion, the Third Circuit published two "Fagan v. Vineland" opinions on the same day, albeit with different reporter cites. The first held that municipal and officer liability were not co-extensive, Fagan I. The second, an en banc decision, held the proper mens rea for officer liability during pursuits was intent to harm. Fagan II.

judgment, must intend to harm to accrue liability, the municipality, armed "with a wealth of information" and "fully aware of the dangers" of police pursuits ex ante, is liable when its pursuit custom or failure to train officers demonstrates a "deliberate indifference" to life or liberty. Id. In fact, it "is easy to imagine a situation where an improperly trained police officer may be ignorant of the danger created by his actions," while the municipality knows them but "deliberately refuse[s] to require proper training." Id. Allowing a municipality to profit from the protections rightfully shielding the on-the-beat officer could "lead to illogical results." Id. In such cases, the "pursuing police officer is merely the causal conduit for the constitutional violation committed by the City." Id.

This Court recognizes that Fagan I has triggered much commentary, including from the Third Circuit, since its publication. See Grazier ex rel. White v. City of Philadelphia, 328 F.3d 120, 124 n.5 (3d Cir. 2003) (confining Fagan I "to its facts: a substantive due process claim resulting from a police pursuit"); Mark v. Borough of Hatboro, 51 F.3d 1137, 1153 n.13 (3d Cir. 1995) (suggesting the Fagan I panel misconstrued the law). Yet grumblings are not grounds for reversal. To the contrary, the Third Circuit has confirmed that a municipality may be "independently liable for a substantive due process violation" even when no officer is liable since Fagan I. See Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006) (per curiam); Brown v. Commonwealth of Pennsylvania, Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482 (3d Cir. 2003) (citing Fagan I holding approvingly). And most recently, the Court reaffirmed that municipal liability is cognizable, even when officer liability is not, so long as its finding would not create an "inconsistent verdict." Mervilus v. Union County, 73 F.4th 185, 196–97 (3d Cir. 2023) (emphasis in original). Following Fagan I, because the level of "shocks the conscience" culpability is different for officers and municipalities in police pursuit cases,

municipal liability is not inconsistent with granting summary judgment for the officers. Id.; see, e.g., Igwe v. Skaggs, 2017 WL 395745, at *8 (W.D. Pa. Jan. 30, 2017) (granting motion to dismiss as to officer defendants in pursuit but denying it with respect to municipality).

Municipalities are liable when they maintain a "policy or custom" that violates constitutional rights. Thomas v. Cumberland County., 749 F.3d 217, 222 (3d Cir. 2014). When the policy or custom is not on its face unconstitutional, plaintiffs must show the custom was "the moving force behind the constitutional tort" of its employees. Colburn v. Upper Darby Township, 946 F.2d 1017, 1027 (1991). A "policy" is an act of the official decision-making body while "customs" are subterranean practices that are "so widespread as to have the force of law." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404 (1997).

Failure to train claims represent another vintage of municipal liability. Connick v. Thompson, 563 U.S. 51, 61 (2011). To make out a failure to train claim, plaintiff must prove the inadequate training amounted to a "deliberate indifference to the rights of persons with whom the police come into contact." Canton v. Harris, 489 U.S. 378, 388 (1989). Only then "can such a shortcoming be properly thought of as a[n actionable] city 'policy or custom.'" Id. at 389. Ordinarily, a plaintiff must show a pattern of similar constitutional deprivations to demonstrate that policymakers "continued adherence to an approach that they know or should know has failed to prevent tortious conduct," in "conscious disregard for the consequences of [officer] actions." Connick, 563 U.S. at 62.

Custom and failure to train claims bear a "close relationship" because both usually rest on the municipality's pattern and practice of behavior. Forrest v. Parry, 930 F.3d 93, 106 (3d Cir.

2019).[19] To prevail on a custom theory, a plaintiff must show an infirm "course of conduct so well-settled and permanent as to virtually constitute law." Forrest, 930 F.3d at 106. Meanwhile for failure to train claims, plaintiffs often need a history of past inadequacies to reveal "scienter-like evidence" of municipal indifference in response to constitutional deprivations. Simmons v. City of Philadelphia, 947 F.2d 1042, 1060–62 (3d Cir. 1991).

Additionally, the custom or failure to train must be the "moving force" behind the plaintiff's injury. Sanford, 456 F.3d at 314. For custom cases, plaintiffs need an "affirmative link" between the custom and the constitutional injury. Est. of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019). With failure to train, the frequency of a recurring situations and predictability that an officer will respond improperly without adequate training establishes causation. Id. at 800 (citing Brown, 520 U.S. at 409–10).

Here, the overlap in claims is near total because the answer to whether the municipalities were deliberately indifferent to pursuit-related injuries—the second prong in the state-created danger test—is essential for both the custom and failure to train claims.[20] See Roman, 914 F.3d at 799 n.7.

---

[19] The Third Circuit has gone as far as describing "failure to train" cases as a "subcategory of policy or [custom] liability." Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014), rev'd on other grounds Taylor v. Barkes, 575 U.S. 822 (2015).

[20] Judge Pratter's thoughtful analysis in Washington-Pope v. City of Philadelphia is instructive. The underlying question is whether the Boroughs demonstrated deliberate indifference to Plaintiffs' constitutional interest in liberty or life. 979 F. Supp. 2d 544, 573–80 (E.D. Pa. 2013). That mens rea, coupled with causation, makes out liability. Id.

Undoubtedly, a jurist could lose themselves in the Russian nesting dolls of mens rea elements in this Monell claim. Formalistically, the elements of a Monell failure to train theory are (1) an underlying constitutional violation (here, state created danger, which requires deliberate indifference of the municipality) (2) to which the municipality was deliberately indifferent. Collins v. City of Harker Heights, Tex., 503 U.S. 115, 123 (1992). But such legal grafting approaches tautology—the municipality is deliberately indifferent to its deliberate indifference? Along with Judge Pratter, other courts have attempted to "untangle[e]" this "conundrum." See Est. of Thomas v. Fayette Cnty., 194 F. Supp. 3d 358, 378–81 (W.D. Pa. 2016). This Court is satisfied that the relevant inquiry, per Fagan, is much simpler: deliberate indifference to the publics' liberty or life in pursuits makes out liability. Washington-Pope, 979 F. Supp. 2d at 573–80.

1. **Undisputed Facts of Boroughs' Pursuit Policies**[21]

Collingdale and Darby maintain police pursuit policies. The polices, while not identical, require officers balance the safety of the public, other officers, and the fleeing suspect against the immediate and potential danger if the suspect remains at large, before and while engaging in vehicle pursuits. Collingdale Pursuit Policy, Pls.' Ex. V, ECF 98–1.; Darby Pursuit Policy, Pls.' Ex. Y, ECF 98–3. The policies outline various factors for officers to consider when assessing the danger of a given pursuit (i.e. time of day, population density of pursuit area, seriousness of the suspected offense), dictate that only two vehicles should be involved in a pursuit, require a supervisor oversee the pursuit, including the decision to continue or terminate it, mandate that officers relay certain information to supervisors and dispatch regarding the pursuit, and constrain the manners and methods officers may deploy in pursuit. Collingdale Policy IV; Darby Policy at 2–5.

The policies apply when officers may pursue. The Collingdale policy prohibits officers from engaging in pursuits over summary traffic violations or when the danger of the pursuit is greater than the danger of the suspect fleeing. Collingdale Policy IV.A.2. The Darby policy authorizes pursuits only when a "serious violation" of the law has or is about to occur and the pursued individual poses an immediate or potential danger that outweighs the risks of a pursuit.

---

[21] Parties filed many of the exhibits related to the pursuit policies under seal. However, the Third Circuit has long recognized "a presumption of public access, to all judicial records, proceedings, opinions and orders and related pleadings and exhibits." Larry Pitt & Assocs. v. Lundy L., LLP, 346 F. Supp. 3d 761, 766 (E.D. Pa. 2018) (Rufe, J.) (citing Republic of the Philippines v. Westinghouse Electric Corp., 949 F.2d 653, 659 (3d Cir. 1991)). The right to public access specifically "applies to documents and evidentiary materials submitted in support of summary judgment . . . because the need for public scrutiny is at its zenith when the motion is dispositive and is of a comparable level when the motion is denied because the ruling tends to shape the scope and substance of the litigation as the parties proceed to trial." Mine Safety Appliances Company v. North River Insurance Company, 73 F. Supp. 3d 544, 560 (W.D. Pa. 2014). Neither party has overcome this hefty presumption of public access here, which concerns to documents that are over five years old, do not appear to be operative today, and are highly material for this case's disposition. See Nestle Foods Corp. v. Aetna Cas. & Sur. Co., 129 F.R.D. 483, 485 (D.N.J. 1990) ("[t]he purported need for protection is substantially diminished where the passage of time has made such documents stale.").

Darby Policy at 2. Additionally, under the Darby policy, only officers trained in "<u>pursuit driving</u>" may engage in a pursuit. Darby Policy at 2 (emphasis in original).

### 2.   <u>Undisputed Facts of Prior Collingdale and Darby Pursuits</u>

Between 2013 and this incident, Collingdale disclosed involvement in 26 vehicle pursuits. Collingdale Incident Reports, Pls.' Ex. BB, ECF 98–4. Darby disclosed involvement 30 to 35 vehicle pursuits. Darby Incident Reports, Pls.' Ex. CC. Moreover, Collingdale's disclosed pursuits necessarily undercount the accurate number, because several of <u>Darby's</u> reported pursuits were initiated by <u>Collingdale</u>. Darby Incident Reports at 4–5, 7, 39, 134. Nonetheless, none of these <u>Darby</u> reported pursuits were included in <u>Collingdale</u>'s reported pursuits. <u>See</u> Collingdale Incident Reports. Several of the reported pursuits resulted in bystander car accidents and injuries. Pazen Report III.C.i–ii. Moreover, Darby designee and current Police Chief Joseph Gabe testified that the several of Darby's past incidents, based on the police reports transcribing the events, violated the pursuit policy. Pls.' Darby SAF ¶ 147.

### 3.   <u>Undisputed Facts of Collingdale and Darby's Pursuit Training and Procedure</u>

Neither Collingdale nor Darby recalled providing any formal training on pursuit decision-making or driving beyond giving officers the written policies. Pls.' Statement of Fact in Resp. to Defs.' Collingdale and Richers Mot. Summ. J. ¶¶ 119, 122–27, 130, ECF 98 ("Pls.' Collingdale SAF"); Pls.' Darby SAF ¶ 134. In Police Academy officers learned how to maneuver their vehicles, including how to pursue suspects. Defs.' Darby SAF ¶¶ 44–45, 64, 91; Defs.' Collingdale SAF ¶¶ 170, 188. However, the State training did not include, and the Boroughs could remember, conducting any training for deciding when to pursue beyond providing the written policy. Felker Dep. 129:23–130:17, Pls.' Ex. U, ECF 90–3; Darby Dep. 51:12–52:07, Pls.' Ex. X, ECF 82–2. Neither Borough could recall any post-pursuit reviews, investigation, or discipline for any of the

pursuits between 2013 and 2020. Felker Dep. 55:03–56:04; Darby Dep. 234:06–20. Additionally, both Boroughs had failed to follow Pennsylvania law that requires police departments report all vehicle pursuits to a state-wide database prior to this incident. Pls.' Collingdale SAF ¶¶ 145–55. Darby did not report any of its pursuits. Id. Collingdale reported four. Id.

### 4.  **Disputed Facts Whether the Pursuit Violated Collingdale and Darby's Policies**

Parties disagree whether the officers' conduct during the pursuit violated the governing Collingdale and Darby policies. Defendants and Plaintiffs characterize the danger of the pursuit, the involvement of other officers, and the role of supervision differently. Plaintiffs argue that the number of vehicles on the road and disregard of road rules created a high-risk and high-speed pursuit. Pls.' Resp. to Darby at 13–14; Pls.' Resp. to Collingdale at 13–15. Defendants contend the risks were not as substantial. Darby Summ. J. at 5. Plaintiffs also argue there was no adequate supervision of the pursuit, while Defendants counter that Sargent Finley, Collingdale's senior officer on duty, adequately monitored and supervised the incident. Pls.' Darby SAF ¶¶ 84–87; Defs.' Collingdale SAF ¶¶ 131, 141, 164, 181–82. Finally, Plaintiffs and Defendant disagree over how many other vehicles followed Jones in pursuit. Pls.' Darby SAF ¶¶ 69–70, 92, 94; Defs.' Darby Reply to Pls.' SAF ¶¶ 69–70, 92, 94, ECF 102–1.

### 5.  **Application**

#### i.  *Officers Conduct May Have Violated Pursuit Policies*

As a preliminary matter, it is a disputed and material fact whether this pursuit violated Collingdale and Darby pursuit policies. This is material because Plaintiffs do not challenge the written policies. Consequently, if the officers properly followed an admittedly constitutional written policy, no violation could lie. Reviewing the record, many genuine disputes arise on this point. For instance, was Officer Richers engaged in a "pursuit"—radioing to over ten jurisdictions

that Jones was "taking off on" him—over summary traffic offenses prior to reaching McDonalds; was Officer Richers again pursuing Jones for traffic infractions in the McDonalds parking lot before the collision with Lyons; were any officers supervising the pursuit as directed under the policies; did Richers and Lynch operate their vehicles in accordance with the policies; did a convoy of other officers join the pursuit in violation of policy; did Officer Richers and Lyons communicate effectively and accurately as the pursuit transpired; and was it reasonable to consider Jones' scrape with Officer Lyons' van an aggravated assault to justify pursuit under the policies? These potential violations are non-exhaustive.

As such, a reasonable jury could find the pursuit violated policy. The next question is whether a custom of reckless pursuits or the Boroughs' deliberate indifference to train officers was the "moving force" behind these violations. While these claims are analytically distinct, the evidence underlying them is largely the same.

### ii.  Collingdale and Darby's Contentions

Plaintiffs argue the Borough Defendants had a custom of permitting high-speed pursuits over minor traffic infractions and failed to train officers in the initiation, supervision, and continuance of pursuits. Pls.' Resp. to Darby at 21–27. They claim the lack of pursuit training, extensive history of dangerous pursuits over traffic infractions, and total failure to investigate or discipline officers as a result of any prior pursuits demonstrate both a pattern of conduct the Boroughs ignored and a widespread practice of reckless pursuits. Id. Defendants counter that Plaintiffs fail to show either an unconstitutional custom or deficient training. Darby Summ. J. at 11–15; Collingdale Summ. J. at 14–15. Regarding custom, Defendants contend the existence of prior pursuits does not prove they were improper. Darby Summ. J. at 11–15; Collingdale Summ. J. at 14–15. Without a formal investigative or statistical analysis, they argue, the prior incidents

are not germane. Darby Summ. J. at 11–15; Collingdale Summ. J. at 13–15. Moving to the failure to train, Defendants argue academy training in pursuit driving, the Boroughs' directions that officers read their pursuit policies, and the relevant officers' (Lyons, Lynch, and Richers) awareness of the policies shows that, whatever the deficiencies of this pursuit, lack of training was not the causal link for the accident. Darby Summ. J. at 11–15; Collingdale Summ. J. at 15–19.

### iii.   Collingdale and Darby's Pursuit Custom and Failure to Train Officers

Plaintiffs' have raised genuine disputes over whether the Boroughs' defective customs and training were the moving force of constitutional violations. First, Pazen's Report analyzed every prior pursuit in the years leading up to this incident. For Collingdale, he opines that over 80% of their 26 pursuits since 2015 began over summary or minor offenses in derogation of policy. Pazen Report III.C.i. And prior deprivations of rights were not merely hypothetically. Nine pursuits ended with property damage or human harm. Id. Moreover, many of the same officers, including Officer Richers, had participated in the improper pursuits. Id. For Darby, Pazen writes that 12 of their pursuits between 2013 and 2020 violated policy, again with many resulting in property damage or personal injury. Id. at III.C.ii. His analysis of prior incidents is precisely the sort of evidence required to prove a pattern of deficiency. See Harris v. City of Philadelphia, 171 F. Supp. 3d 395, 400–03 (E.D. Pa. 2016) (Kelly, J.) (finding Department of Justice Investigation into municipal defendant's deficient use of force policy allowed plausible failure to train and custom liability claims).[22]

Second, the Boroughs' purported inaction in response to every one of these incidents reinforces an inference of approval. The Boroughs did not produce records or testimony of any

---

[22] To the extent the Plaintiff's expert reports are short of the Department of Justice's standards, Defendants cannot profit from their own failure to record or investigate past incidents as advantage in this lawsuit. Plaintiffs, utilizing deposition and subpoena gathered sufficient evidence to render triable facts to a jury.

discipline, investigation, or re-training as a result of any of their collectively 60-odd pursuits. Pazen Report III.B.ii.3; Darby Dep. 233:1–234:20; Felker Dep. 53:21–58:01, 61:18–67:18. Rather they made two respective pursuit policy changes in that time. Collingdale implemented a new written pursuit policy in October, 2019 because "it was time." Felker Dep. 98:17–25. Meanwhile, around the time Larry Krasner was elected Philadelphia District Attorney, Darby ordered its officers terminate pursuits at the City limit because "Krasner was just locking up cops left and right." Smythe Dep. 51:13–53:22, Defs.' Ex. G, ECF 68–5. And the Collingdale supervisor responsible for overseeing this pursuit, when asked what factors he has considered when deciding to engage in pursuits, responded that his "primary concern" in past pursuits was not officer or suspect safety but damaging "brand new" police vehicles. Finley Dep. 73:01–75:21, Pls.' Ex. M, ECF 82. The Boroughs' failure to follow Pennsylvania's mandatory reporting of pursuits—a requirement enacted to promote state-wide accountability—allows a further inference of indifference to their potential danger.[23]

Finally, viewing the record in the light most favorable to Plaintiffs, the Boroughs failed to provide any training on when or how to conduct vehicle pursuits beyond, at most, providing officers with the written documents. Collingdale and Darby's pursuit policy "training" consisted of handing officers hundreds of pages of police procedure, which included the pursuit policy, and telling them to read it. Felker Dep. 70:12–71:10, 129:23–132:10; Darby Dep. 44:16–46:22. While officers received classroom training on <u>how</u> to operate a vehicle during a pursuit at police academy, no evidence suggests they received any corresponding training for <u>when</u> to initiate a pursuit. Justice O'Connor's oft-repeated scenario reflects this exact point. In <u>Harris</u>, she explained that a

---

[23] The Court takes judicial notice of Pennsylvania's annually published pursuit data. From 2015 to 2020, between 29.91% and 34.76% of reported pursuits resulted in a vehicle crash. From 2015 to 2020, between 10.86% and 13.49% of reported pursuits caused injuries. PA. POLICE PURSUIT REPORTING UNIT, POLICE PURSUIT REPORTING SYSTEM: FIVE-YEAR TREND ANALYSIS (last accessed Jan. 31, 2024), https://perma.cc/BB5M-KBHN.

municipality, "arm[ing] its officers with firearms," would be liable if they did not also train them on <u>when</u> to deploy force. 489 U.S. at 390 n.10. Considering the uncontested danger high-speed pursuits pose to the public, no matter how deftly an officer operates his vehicle, inadequate training on when to pursue predictably leads to injury.[24] <u>See</u> <u>Cooper v. Merrill</u>, 736 F. Supp. 552, 568 (D. Del. 1990) (finding "the need for training regarding police pursuits" as "patently obviously" and, therefore, analogous to <u>Harris</u>'s hypothetical).

### iv.   Discussion of Precedent and Conclusion re: <u>Monell</u> Claims

In accumulation, this evidence is enough to survive summary judgment. In their motions, Defendants point to unpublished in-circuit district court decisions that found providing officers with a written pursuit policy satisfied a municipality's training obligations. <u>See</u> <u>McNeil v. Borough of Folcroft</u>, 2014 WL 5880125 at *4 (E.D. Pa. Nov. 13, 2014) ("A practice of providing new officers with a proper written pursuit policy and instructing them to read it, coupled with a reliance on the recent training those officers had previously received on this subject, cannot be characterized as a 'failure to train.'") (Bartle, J.); <u>Jewell v. Ridley Twp.</u>, 2011 WL 5524260, at *9 (E.D. Pa. Nov. 10, 2011) (Surrick, J.), <u>aff'd</u>, 497 F. App'x 182 (3d Cir. 2012) (granting summary judgment to municipal defendant when officers had completed academy training and were generally familiar with the written pursuit policy). But critically absent in both <u>Jewell</u> and <u>McNeil</u>

---

[24] Defendant Collingdale's contention that the Borough police chief is not a final policymaker to impute municipal liability is unavailing in this case. First, municipal police chiefs are plausibly final policymakers when they promulgate training materials and retain authority to evaluate and control officers' conducts. <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1481 (3d Cir. 1990) <u>separate holding superseded in part by statute</u> Pub. L. No. 102–166, 105 Stat. 1072; <u>McTernan v. City of York, PA</u>, 564 F.3d 636, 658–59 (3d Cir. 2009) (identifying police chief as policymaker). But more importantly, in custom and failure to train cases, in contrast to official policy claims, Pennsylvania police chiefs are routinely the relevant policymakers because of their determinative role in running the department. <u>See, e.g.</u>, <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 973 (3d Cir. 1996) (Pittsburgh police chief knew or should have known that officers used excessive force as custom); <u>Watson v. Abington Twp.</u>, 478 F.3d 144, 156 (3d Cir. 2007) (Police chief was "undisputed" decisionmaker to impute municipal liability when police department had custom of racial bias in enforcement).

is a history of past violations. Jewell, 2011 WL 5524260 at *9 (noting that plaintiff did not allege a history of accidents resulting from pursuits).

Indeed, the presence of past violations, or lack thereof, is frequently the fulcrum point for custom and failure to train cases. Compare Fulkerson v. City of Lancaster, 801 F. Supp. 1476, 1485 (E.D. Pa. 1992) (Van Antwerpen, J.), aff'd, 993 F.2d 876 (3d Cir. 1993) (finding municipality could not have been on notice to better train officers when there was no evidence of previous injuries or collisions in high speed chases); Carroll v. Borough of State College, 854 F. Supp. 1184, 1198 (M.D. Pa. 1994) (granting summary judgment for municipality when only prior pursuit accident was caused by a different municipality); Burga v. City of Plainfield, 2020 WL 2513507 at *13 (D.N.J. May 15, 2020) ("plaintiffs present no evidence of a pattern of constitutional violations during police pursuits") with Gilyard v. Stylios, 1998 WL 966010 at *8 (E.D. Pa. Dec. 23, 1998) (Shapiro, J.) (denying summary judgment against city because plaintiffs presented evidence of "a large number of preventable accidents occurring in the course of similar" pursuits coupled with a failure to discipline officers); Igwe, 2017 WL 395745 at *8 (allowing case to proceed because plausible that officers routinely violated pursuit policy).

Altogether, a reasonable jury could find the past pursuits, and the Boroughs' lack of remedial actions in their wake, established a custom of authorizing pursuits with a deliberate indifference to the dangers they presented. Similarly, the history of pursuits and resulting damage may have put the Boroughs on notice that training was woefully inadequate to protect the publics' constitutional rights, such that failure to act evinced a deliberate indifference to them. Based on this same history of potential violations, their predictable recurrence, and the Boroughs' refusal to take any remediation, a jury could conclude the custom and failure to train caused and were the moving forces behind the officers' policy violations, and, consequently, Plaintiffs' injuries.

IV.    **STATE CLAIMS**

In addition to the constitutional claims, Plaintiffs brought state law claims against Defendants related to the officers' alleged negligent or reckless driving during the pursuit, the emotional damage wrought on Plaintiff Dellavecchia when she witnessed her sister's death, and municipal Defendants' respondeat superior liability under state law. Because this Court chooses to bifurcate the trial on the state law claims, it will defer ruling on summary judgment, with one exception. Defendant Lyons is entitled to summary judgement, because, as discussed supra, his actions are too remote to satisfy causation. See Fulkerson, 801 F. Supp. at 1485.

A.    **Bifurcation of Trials**

Under Rule 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court" may separately try claims and defendants. Bifurcation "is entrusted with wide discretion" to the trial judge. Reed v. Philadelphia, Bethlehem & New England R.R. Co., 939 F.2d 128, 133 (3d Cir. 1991).

Bifurcation is appropriate here for two reasons. First, the legal standards and nucleus of facts between the state law and Monell claims are quite distinct. The facts supporting a Monell claim "involve the City's policy or lack of policy" regarding pursuits, which is a "much broader issue than the Officers' conduct toward the plaintiff" in this discrete event. Wilson v. City of Chicago, 900 F. Supp. 1015, 1022 (N.D. Ill. 1995) (Gettlemen, J.). Much of the Monell presentation at trial, including the Boroughs' knowledge of past pursuits, the propriety of past pursuits, the number of past pursuits, the conduct during past pursuits, and the response to past pursuits, "which make up the core of the Monell claim and defense, are unnecessary" to the state law claims, which boil down to whether the officers drove negligently or recklessly during the

pursuit.[25] Id. at 1023. See also Jones v. Haga, 2006 WL 2038006 at *6 (D. Col. Jul. 17, 2006) (Figa, J.) (holding that municipal liability claims against police department did not share common nucleus of facts with state law allegations of officer misconduct); Westmark Dev. Corp. v. City of Burien, 2011 WL 252917, at *5 (W.D. Wash. Jan. 26, 2011) (Martinez, J.) ("[t]here can be no common nucleus of operative facts between the state law claims that were pursued and the § 1983 claim against the City . . . because an essential requirement for the § 1983 claim was missing from the state court claims").

Second, novel and complex questions of state law caution this Court. Defendants argue that officer Defendants are entitled to official immunity for the state claims. 42 Pa. Cons. Stat. Ann. § 8550.  However, this Court is unaware of any case law analyzing the official immunity statute's applicability to officers injuring a bystander while pursuing a fleeing suspect. See, e.g. Alex G. ex el. Stephen G. v. Bd. of Trustees of Davis Joint Unified Sch. Dist., 332 F. Supp. 2d 1315, 1320 (E.D. Cal. 2004) (Levi, J.) (declining to hear state law case when official immunity issues raised "both novel and complex issues of state law); UMC Dev., LLC v. D.C., 401 F. Supp. 3d 140, 158 (D.D.C. 2019) (same). In the same vein, the scope of immunity over police officers "implicate[s] distinctly local policy interests," that may be best left for a state court to decide. UMC Dev., LLC v. D.C., 982 F. Supp. 2d 13, 21 (D.D.C. 2013) (Kessler, J.). Because the evidentiary and legal dissimilarities are likely to prejudice Defendants, and a state court may be better suited to deciding the immunity claims, bifurcation is appropriate.[26]

---

[25] Plaintiffs' state law claims against the Boroughs are largely asserting a theory of vicarious liability for the officer Defendants' actions.

[26] This Court may revisit its decision to exercise supplemental jurisdiction over the Plaintiffs' state law claims pending the Monell trial.

**V.**     <u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motions for summary judgment is **GRANTED** in part and **DENIED** in part. An appropriate **ORDER** will follow.